FILED

2010 SEP 14  PM

CLERK U.S. DISTRICT
NORTHERN DISTRICT OF OHIO
CLEVELAND

JUDGE LIOI

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **INDICTMENT** |
| | ) | |
| Plaintiff, | ) | JUDGE **1:10CR387** |
| | ) | |
| v. | ) | CASE NO. |
| | ) | |
| JAMES C. DIMORA | ) | Title 18, United States |
| BRIDGET M. MCCAFFERTY | ) | Code, Sections 2, 371, 664, 666, 1001, 1349, |
| ROBERT W. RYBAK | ) | 1512, 1519 & 1951; Title 29, United States |
| JERRY J. SKUHROVEC | ) | Code, Section 501(c) |
| MICHAEL D. GABOR | ) | |
| WILLIAM N. NEIHEISER, | ) | |
| | ) | |
| Defendants. | ) | |

The Grand Jury charges:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

**Public Entities**

1.      Cuyahoga County, Ohio ("County") was a government body whose departments

included the Cuyahoga County Auditor's Office ("Auditor's Office"), Cuyahoga County

Engineer's Office ("Engineer's Office"), and Cuyahoga County Sheriff's Office ("Sheriff's

Office"), each of which was headed by an elected public official.

2.      The Board of Cuyahoga County Commissioners ("County Commissioners") was

the central governmental body of the County, consisting of three co-equal members who were

elected at large for four-year terms.  Each year, the County Commissioners elected a president,

1

who served on the Board of Revision and the County Records Commission. The County

Commissioners' powers included budgeting, levying taxes, issuing bonds, letting contracts for

public works services, monitoring expenditures, administering purchases, and making personnel

decisions. The County Commissioners were also responsible for approving all collective

bargaining agreements and administering federal grant monies.

3.      The County Commissioners had authority to appropriate funds for the operations

of their own agencies and other elected County officials, including the County Auditor, County

Engineer, County Prosecutor and the Cuyahoga County Court of Common Pleas ("Common

Pleas Court").

4.      The operations of the Common Pleas Court affected interstate commerce.

5.      The operations of the County affected interstate commerce.

6.      The operations of the County Commissioners affected interstate commerce.

7.      The operations of the Auditor's Office affected interstate commerce.

8.      The operations of the Engineer's Office affected interstate commerce.

9.      The operations of the Sheriff's Office affected interstate commerce.

10.     The Ohio Public Employees Retirement System ("OPERS") was a state pension

fund located in Columbus, Ohio. OPERS provided retirement, disability and survivor benefit

programs for public employees throughout the State of Ohio, who were not covered by another

state or local retirement system. OPERS was established in or around 1935 to make available a

secure means to provide retirement for Ohio public employees. The system was originally

named the Public Employees Retirement System ("PERS") and changed in or around 2003 to

2

become OPERS.  In order to obtain OPERS benefits, it is necessary for the public employee to complete Form A, and mail it to OPERS in Columbus, Ohio.

11.    School Districts 1 and 2 were public school districts located within the County.

**Private Entities**

12.    Alternatives Agency ("AA") was a non-profit organization that provided treatment and rehabilitation services to post-incarceration individuals in criminal cases who had been ordered to receive such services.  The funding AA received from the County was controlled, in part, by the Cuyahoga County Corrections Planning Board, which fell under the auspices of the Common Pleas Court.  AA was located on East 55th Street in Cleveland, Ohio.

13.    AA's operations affected interstate commerce.

14.    DAS Construction ("DAS") was a commercial construction company located in Garfield Heights, Ohio, with experience as a general contractor, construction manager, and design builder.  DAS Development Inc. was related to DAS.

15.    The operations of DAS affected interstate commerce.

16.    Green-Source Products, LLC ("Green-Source") was a manufacturer of green building products located in Cleveland, Ohio.  Steven Wayne Pumper was a de facto executive of Green-Source.

17.    IceLand USA-Lakewood, LLC ("Winterhurst") was an ice skating rink located in Lakewood, Ohio.  Winterhurst's operations affected interstate commerce.

18.    Local Union No. 55 ("Local 55") was a labor organization, within the meaning of Title 29, United States Code, Section 402(i) and (j), engaged in an industry affecting interstate

3

commerce. Local 55 was a subordinate chapter of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, which represented plumbers working for private companies and public entities in the Northern District of Ohio. Its operations affected interstate commerce.

19. The Joint Apprenticeship and Training Committee Fund ("JATC"), was a Local 55 employee benefit plan that was designed to provide training and classes for Local 55 members. The JATC was subject to the provisions of Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"). Its operations affected interstate commerce

20. The JATC had a committee consisting of six trustees: Three Local 55 union members and three contractors. The three Local 55 members were appointed by the Local 55 Business Manager. The responsibilities of the JATC committee were to promote the education and training of Local 55 apprentices, to review expenditures and purchases made by the JATC and to ensure the financial well-being of the JATC.

21. Reliance Mechanical, LLC ("Reliance Mechanical") was a heating, air conditioning, and plumbing contracting company located in Cleveland, Ohio.

22. Reliance Mechanical's operations affected interstate commerce.

23. Salva Stone Design ("Salva Stone") was a granite retailer located in Cleveland, Ohio. Salva Stone purchased granite from suppliers and custom fabricated the granite before installing it for customers. Its operations affected interstate commerce.

24. Zavarella Brothers Construction Company ("ZBC") was a masonry subcontractor located in Bedford Heights, Ohio. ZBC subcontracted its services to general contractors on

4

private retail, commercial and office building construction projects.  Its operations affected interstate commerce.

25.    Business 5 was a privately owned development firm.  Business Executive or Employee 7 ("BE7") was an officer or employee of Business 5.  Business 5's operations affected interstate commerce.

26.    Business 14 was an electrical and technology contracting company located in Bedford Heights, Ohio.  Its operations affected interstate commerce.

27.    Business 30 was an Ohio limited liability company, operating to provide consulting and government relations services.  JAMES C. "JIMMY" DIMORA and Frank P. Russo had an interest in Business 30's success.

**Public Officials and Employees**

28.    Defendant JAMES C. "JIMMY" DIMORA ("DIMORA") was an elected County Commissioner, whose responsibilities included budgeting, levying taxes, issuing bonds, letting contracts for public works services, monitoring County expenditures, administering all purchases for County use, and approving funding to build and maintain certain roads.  In addition, DIMORA had the authority to influence personnel decisions within the County, including hiring, approving raises and promotions, terminating employment, and establishing job duties.

29.    Frank P. Russo ("Russo") was the County Auditor, an elected County official.  He was the County's chief fiscal officer, with overall responsibility for all County funds.  As the Auditor, Russo served as secretary to the Board of Revision, which had responsibility to rule on property assessments and hear valuation complaints, and as secretary to the Automatic Data

5

Processing ("ADP") Board, which reviewed information technology related purchases and contracts for the County.  Russo had the power to influence contracts and expenditures within the Auditor's Office and had authority over personnel decisions within the Auditor's Office, including hiring, approving raises and promotions, terminating employment, and establishing job duties.

30.    Defendant MICHAEL D. GABOR ("GABOR")  was an Auditor's Office employee.

31.    Defendant BRIDGET M. MCCAFFERTY ("MCCAFFERTY") was a Common Pleas Court judge.

32.    Defendant JERRY J. SKUHROVEC ("SKUHROVEC") was an Auditor's Office employee, who obtained employment with the Sheriff's Office in or around April 2008. SKUHROVEC also had an ownership interest in Bat-A-Rama Batting Cages in Maple Heights, Ohio.

33.    SKUHROVEC's activities affected interstate commerce.

34.    John Kevin Kelley ("Kelley") was employed in various positions within County government from approximately 1998 through June 2009.  In 2004, Kelley became the Geographic Information Systems ("GIS") project manager.  His salary was funded in equal parts by the budgets of the Engineer's Office, the Auditor's Office, and the County Commissioners. From in or around January 2000 until in or around March 2009, Kelley served on the Parma City School District Board of Education, an elected position.  In both of those roles, Kelley had the power to influence public policy, contracts and expenditures.  In addition to his public

6

employment, in or around May 2003, Kelley created a consulting business, J. Kevin Kelley Consulting, LLC.

35. Kevin F. Payne ("Payne") served as the Chief of Staff at the Engineer's Office from in or around September 2002 to in or around February 2009. In that capacity, Payne had the power to influence public policy, contracts and expenditures and to oversee hiring and promotion in the Engineer's Office. Payne was also responsible for administrative matters at the County Sanitary Engineer's Office. In that capacity, he was responsible for negotiating with the respective unions. Payne was Kelley's supervisor at the Engineer's Office. Payne was also an attorney licensed to practice law in the State of Ohio.

36. The activities of Payne and Payne's law practice affected interstate commerce.

37. Public Official 3 ("PO3") was an elected County official with jurisdiction over inspectors on road construction projects.

38. Public Official 6 ("PO6") was an elected public official with the power to influence certain aspects of City of Cleveland contracting.

39. Public Official 7 ("PO7") was an elected public official with the power to influence certain aspects of contracting for a municipality located within the County.

40. Public Official 8 ("PO8") was a County Domestic Relations Court judge.

41. Public Officials 9 and 10 ("PO9" and "PO10") were elected County officials, whose responsibilities included budgeting, levying taxes, issuing bonds, letting contracts for public works services, monitoring County expenditures, administering all purchases for County use, and approving funding to build and maintain certain roads. In addition, PO9 and PO10 had

7

the authority to influence personnel decisions within the County, including hiring, approving raises and promotions, terminating employment, and establishing job duties.

42.     Public Official 11 ("PO11") was a candidate for County Probate Court, who won election in or about November 2008.  PO11 was a relative of Russo.

43.     Public Official 12 ("PO12") was an elected County official responsible, among other duties, for maintaining public safety, custodial care, law enforcement and selling foreclosed properties.  PO12 had the power to influence personnel decisions within the office to which PO12 was elected, including hiring, approving raises or promotions, terminating employment, and establishing job duties.

44.     Public Official 13 ("PO13") was Clerk of Courts for a municipality located within the County.

45.     Public Official 14 ("PO14") was an elected public official with the power to influence certain aspects of contracting for a municipality located within the County.

46.     Public Official 15 ("PO15") was a Common Pleas Court judge.

47.     DIMORA was an agent of the County as defined in Title 18, Section 666(d)(1), United States Code.

48.     Russo was an agent of the County as defined in Title 18, Section 666(d)(1), United States Code.

49.     Kelley was an agent of the County as defined in Title 18, Section 666(d)(1), United States Code.

50.     Public Employee 1 ("PE1") was employed by the Engineer's Office.

8

51.    Public Employee 10 ("PE10") was a County employee with jurisdiction over certain aspects of County contracting, including responsibilities related to the County's Small Business Enterprise ("SBE") and Minority Business Enterprise ("MBE") requirements.

52.    Public Employee 11 ("PE11") was a County employee who reported to DIMORA.

53.    Public Employee 13 ("PE13") was an employee of the County Commissioners' Office with management and policy responsibilities.

54.    Public Employee 15 ("PE15") was a County employee with jurisdiction over smoking issues.

55.    Public Employee 18 ("PE18") was a County employee who reported to DIMORA, and whose responsibilities included maintaining DIMORA's schedule.

56.    Public Employee 19 ("PE19") worked in the County Department of Development.

57.    Public Employee 21 ("PE21") was a County employee working in DIMORA's office.

58.    Public Employee 22 ("PE22") was a student employed at times by the County.

59.    Public Employee 23 ("PE23") was appointed by the County Commissioners as the County's chief operating officer.  PE23 served in that role until in or around July 2008.

60.    Public Employee 24 ("PE24") was a Sheriff's Office employee.

61.    Public Employee 26 ("PE26") was the Human Resource Manager for a municipality located within the County.

62.    Public Employee 27 ("PE27") was a County employee working in Dimora's office.

9

63.     Public Employee 37 ("PE37") was an agent of the City of Cleveland Building and Housing Department. PE37 worked as a building inspector, responsible for inspecting structural work on commercial and residential construction projects within the City of Cleveland to ensure compliance with the City of Cleveland's building and zoning codes. At all times material to Counts 20 and 26 of this Indictment, PE37 was cooperating with the government.

64.     Public Employee 38 ("PE38") was employed by the State of Ohio.

65.     Public Employee 39 ("PE39") was employed by a municipality located within Cuyahoga County.

66.     Public Employee 52 ("PE52") was employed in the County Department of Development.

67.     Public Employee 55 ("PE55") was Russo's domestic partner and at various times, a County employee.

**Other Individuals**

68.     Defendant WILLIAM NEIHEISER was the president and Chief Executive Officer of Reliance Mechanical. NEIHEISER had an ownership interest in Reliance Mechanical and in Winterhurst, an ice-skating facility in Lakewood, Ohio.

69.     NEIHEISER's activities affected interstate commerce.

70.     Defendant ROBERT RYBAK ("RYBAK") was the Local 55 Business Manager from on or about July 20, 2004, until the filing of this Indictment. RYBAK was the Training Director from in or around 1989 until on or about July 20, 2004. As Training Director, RYBAK was a fiduciary of the JATC, pursuant to 29 U.S.C. Sections 1002(16), 1104, and 1106 of

10

ERISA. RYBAK, therefore, occupied a position of trust in relation to the JATC and its participants as a group while serving as the JATC Training Director. As the Local 55 Business Manager, RYBAK was a trustee for the JATC. RYBAK, as a trustee and committee member of the JATC, was a fiduciary of the JATC, pursuant to 29 U.S.C. Sections 1002(16), 1104, and 1106 of ERISA. RYBAK therefore occupied a position of trust in relation to the JATC and its participants as a group while serving as Local 55 Business Manager. RYBAK was a relative of PE21 and PE22.

71.     Daniel P. Gallagher ("Gallagher") was employed in the Engineer's Office until he retired in 2002. Thereafter, he served as a consultant, eventually forming a consulting company.

72.     Ferris Kleem ("Kleem") was the Vice-president of Blaze Construction Co., Inc. ("Blaze Construction"), president and majority owner of Blaze Building Corporation ("Blaze Building"), half owner of Phoenix Cement, Inc. ("Phoenix"), and 60% owner of FJR Properties, Ltd., all located in Berea, Ohio. Kleem was PO7's relative.

73.     The activities of Kleem, Blaze Construction and Blaze Building affected interstate commerce.

74.     Steven Wayne Pumper ("Pumper") was the Chief Executive Officer of DAS, an officer of DAS Development, Inc., the manager of Parkview Housing, LLC, the manager of Allerton Apartments, L.P., and a partner in multiple development projects in Northeast Ohio.

75.     Pumper's activities affected interstate commerce.

76.     Brian Schuman ("Schuman") was an employee of AA.

77.     John Valentin ("Valentin") was a principal in Salva Stone.

11

78.    Nicholas A. Zavarella ("Zavarella") was a shareholder of ZBC.

79.    Business Executive or Employee 8 ("BE8") had an interest in real estate he wished to sell to the County and also had an interest in two apartment buildings on Cleveland's west side.

80.    Business Executive or Employee 10 ("BE10") was the president of Business 14.

81.    Business Executive or Employee 13 ("BE13") was a principal and agent of Business 30. BE13 facilitated the finding of business, including public business, for Business 30's clients. BE13 was Russo's relative. One of Business 30 and BE13's clients, Business 22, was an MCO; that is, a health organization that financed and delivered health care using a specific provider network and specific provider services. Business 22 retained Business 30 and BE13 to solicit public and private employers to contract with Business 22. Business Executives or Employees 15 and 16 ("BE15" and "BE16") were principals of Business 22.

82.    Business Executive or Employee 24 ("BE24") was employed by Local 55.

83.    Business Executive or Employee 25 ("BE25") was a principal and 49% owner of Business 38, which was a design and architectural firm with offices in Cleveland, Ohio, and New York, New York.

84.    Business Executive or Employee 29 ("BE29") was an employee or agent of an engineering support services company located in the greater Cleveland area.

85.    Plumber 1 was a member of Local 55.

86.    Plumber 2 was a member of Local 55.

12

87.     Attorney 1 was an attorney licensed to practice law in the State of Ohio and a

partner in a law firm doing business in the Northern District of Ohio and elsewhere.  Attorney 1

also served as a lobbyist/consultant for clients seeking municipal contracts.  His clients included

AA.

The Grand Jury further charges:

## COUNT 1
(Conspiracy to Commit Mail Fraud and Honest Services Mail Fraud, 18 U.S.C. §§ 1341 and
1346, in violation of 18 U.S.C. § 1349 )

88.     Paragraphs 1-3, 12, 28-29, 34, 46, 52-53, 59, 67, 76 and 87 of this Indictment are

re-alleged and  incorporated by reference as if fully set forth herein.

## THE CONSPIRACY

89.     From in or about November 2007 through on or about January 20, 2009, the exact

dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and

elsewhere, Defendant JAMES C. DIMORA, and Frank P. Russo (not charged herein), John

Kevin Kelley (not charged herein), Brian Schuman (not charged herein), Attorney 1 (not charged

herein), and others known and unknown to the Grand Jury, did knowingly and intentionally

combine, conspire, confederate and agree with each other to commit offenses against the United

States; that is, to knowingly devise and intend to devise a scheme and artifice:

(1) to defraud and deprive Cuyahoga County and its citizens of their right to the honest

and faithful services of DIMORA, through bribery and kickbacks and the concealment of

material information related thereto, and

13

(2) to defraud Cuyahoga County and to obtain money and property by means of materially

false and fraudulent pretenses, representations and promises,

and for the purpose of executing such scheme and artifice, to cause matters to be placed in any

post office and authorized depository for mail matter to be sent and delivered by the United

States Postal Service and private and commercial interstate carrier, in violation of Title 18,

United States Code, Sections 1341 and 1346.

## OBJECT OF THE CONSPIRACY

90.     It was the object of the conspiracy that DIMORA, with Russo's assistance,

secretly used his official position to enrich himself, Russo, and their designees by soliciting and

accepting gifts, payments, and other things of value from AA, in exchange for favorable official

action, and that AA, through Kelley, Schuman and Attorney 1, enriched itself by secretly

obtaining favorable official action for itself through corrupt means.

## MANNER AND MEANS

It was part of the conspiracy that:

91.     DIMORA and Russo solicited and accepted gifts, payments, and other things of

value from AA, including meals and travel from Cleveland to Las Vegas for DIMORA, Russo

and PE55.

92.     DIMORA, with Russo's assistance, provided favorable official action for the

benefit of AA as requested and as opportunities arose.

93.     The conspirators took steps to hide, conceal, and cover up their activity and the

nature and scope of AA's dealings with DIMORA.

14

Acts in furtherance of the conspiracy

94.     In or about November 2007, after County Probation Department officials told Schuman that the County intended to eliminate its contract with AA for 2008, Schuman and Attorney 1 asked Kelley to help restore AA's funding.

95.     Kelley asked Russo and DIMORA to assist in restoring AA's funding and in obtaining additional funding.

96.     Kelley received money from AA for his role in obtaining Russo's and DIMORA's assistance.

97.     In or about December 2007, Russo and DIMORA each talked to other public employees with responsibility and influence over funding.

98.     On or about December 21, 2007, Kelley informed Attorney 1 he had good news regarding AA. Kelley indicated that PE13 told Russo that the County was re-working the budget, and AA would be back in the budget. Kelley then instructed Attorney 1 to call and thank Russo. Attorney 1 agreed and said, "You and I need to get together on this too, you know what I mean."

99.     On or about December 21, 2007, Kelley told Schuman that a County employee called Russo and DIMORA, telling them that a funding mechanism was in place to reinstate AA in the County budget. Kelley said that Russo was not given an exact number, but PE13 told Russo things "look good" for AA. Kelley emphasized the importance of AA receiving a budget allocation, because after the budget was in place, DIMORA and Russo could influence other County employees to increase AA's allocation after the Health and Human Services levy passed.

100.    On or about January 4, 2008, Schuman asked Kelley if there were any developments. Kelley said he received a verbal commitment that AA was allocated $400,000 towards 2008, and they were waiting for the paperwork. Schuman replied, "That's f---ing beautiful." Kelley explained that there would be two County funding sources, and the County might make up the difference through the halfway house initiative. Kelley told Schuman that DIMORA had informed Kelley to keep the billing up until the budget allocation was spent, and then DIMORA would find more money once the Health and Human Services levy passed. Kelley said that AA might actually receive more money than it had the prior year. Again, Schuman responded, "That's f---ing beautiful." Kelley told Schuman that Kelley heard about the funding decision from Russo. Kelley ended the conversation by commenting that he always tells people, "Loyalty makes up for brains any day."

101.    On or about January 11, 2008, Kelley told Attorney 1 that AA was allocated $250,000 because AA had only used $500,000 the previous year even though it was budgeted for $600,000. Kelley and Attorney 1 agreed it would be easier for the County to amend and add money in the future, once AA was included in the budget. Kelley said that he was on his way to AA because Kelley just had a meeting with Russo, who was "very clear on what his thoughts are." Attorney 1 replied, "Understood." Attorney 1 and Kelley agreed to meet the following Monday. Kelley then stated, "I am just going to, you know, be coy about it with these guys, but they got to. . . . It's one thing to hold me back a couple months." Attorney 1 replied, "I understand," and inquired whether "the two boys on 55 [referring to AA located on E. 55th Street]" would know about it before Kelley and he met. Kelley said he was on his way to meet

16

with them.

102.    On or about January 16, 2008, Schuman asked Kelley, "How did everything go on Thursday? Did they sign their budget?" Kelley responded, "No they didn't, but it doesn't matter. . . . You're in, you're in the thing but it's not official until they approve it." Kelley continued, "But they're not going to pull it out." Schuman asked if "they're the only one that can do anything with it." Kelley responded, "The only one who can take it out is the Commissioners, and we got two of them on our side on the issue."

103.    In or about January 2008, Attorney 1 instructed Schuman to increase Kelley's monthly fee by $2,000 for four months for the purpose of funding the expenses associated with a Las Vegas trip for DIMORA, Russo and PE55 in April 2008.

104.    Schuman concealed the bribe payment from others at AA by recording the $2,000 increase in AA's books as an increase in Kelley's monthly consulting fee.

105.    On or about February 13, 2008, Schuman, another AA employee, and Kelley met for lunch at Delmonico's restaurant in Independence, Ohio. During that meal, Kelley called DIMORA and said that he was having lunch with Schuman and another AA employee. Kelley said, "Yeah, their thing is on your agenda for tomorrow for their money." DIMORA asked, "Yeah, give 'em more you mean or take it away?" Kelley responded, "No to give 'em back some of their, what you stole from them." DIMORA laughed and said, "I don't wanna know what you get out of this, I don't even wanna f--ing know." Kelley replied, "I get nothing out of this," to which DIMORA responded, "I don't even wanna know. . . . The less I know the better." Kelley responded, "Definitely. The less you know the better is right." Kelley added, "Speaking of that,

17

Vegas." Kelley and DIMORA then discussed reservations for their upcoming trip to Las Vegas.

106.     On or about February 14, 2008, the County Commissioners, with DIMORA

voting in favor, approved a $250,000 allocation for Residential Facilities for the Work Release

Program for the period May 1, 2008 through December 31, 2008, and authorized the Office of

Procurement & Diversity to advertise for bids.

107.     On or about February 22, 2008, Schuman told Kelley that another halfway house

met with PE13 regarding the Sheriff's line item. PE13 was going to meet with another County

employee, who would take it to DIMORA.  Schuman asked Kelley to schedule a meeting with

the other halfway house and DIMORA to discuss the idea.  Schuman said, "They know we got

the juice, so let's just f–in' shove it down their face."

108.     On or about March 6, 2008, Kelley and DIMORA discussed the meeting with AA

and the other halfway house.

109.     On or about March 6, 2008, DIMORA met Kelley, Schuman and others for dinner

at Delmonico's restaurant and discussed public funding for AA.

110.     On or about March 20, 2008, Kelley and Schuman discussed a recent meeting that

DIMORA had with County court officials to promote AA.  Schuman told Kelley it went well,

explaining DIMORA had everyone in the room.  Schuman, as Kelley predicted, "didn't say two

words. JIMMY DIMORA took the lead on the meeting," talking about what he thought and why

it was a good idea.  Schuman said the other halfway houses know we have the "f--ing juice. We

got him in the room.  So it tells everyone else, back off."

111.    On or about March 25, 2008, DIMORA and PE23 discussed the halfway house initiative and the upcoming judges' meeting.  DIMORA said, "I'll go and tell them judges my colleagues agree about saving money and, ya know, basically we just gotta convince these judges if there's some that are skeptical that it's safe to house prisoners there that they don't have to worry about 'em escaping . . . so I just wanna make sure we don't let the thing fall through the cracks that we follow up and get the meeting date when they're gonna have the judges together . . . that's what [PO15] said . . . I'll have you guys come and those halfway house people come to talk to the judges."

112.    Kelley used the additional funds he received from AA to purchase first class airfare aboard Continental Airlines for Russo, PE55, and DIMORA, at a cost of approximately $1,268.50 per ticket.

113.    On or about April 2, 2008, DIMORA and Kelley discussed the flight arrangements for the Las Vegas trip.  DIMORA asked Kelley, "How much is that ticket?  Frank [Russo] and I, 'cause I don't want to have no headaches with the ticket."  Kelley replied, "Ok, I'll talk to you tonight."  DIMORA replied, "I have to bring a check with me, you hear?"  Kelley replied, "I hear you one hundred percent, and I'll take care of that, ok?"  DIMORA replied, "Alright, alright."  Kelley stated, "'Cause, you know, you know what I am saying."  DIMORA replied, "We'll talk about it."

114.    DIMORA and Russo each gave Kelley a check to cover the cost of the airline ticket to make it appear as if DIMORA and Russo each paid for his own ticket.  Russo's check did not include payment for PE55's ticket.  Upon receiving the checks from Russo and

19

DIMORA, Kelley gave them back cash in the approximate amount of the check each had given to Kelley.

115.    On or about April 6, 2008, Kelley telephoned Schuman and said, "Hey, we're heading out now [on the Las Vegas trip]. The guys [DIMORA and Russo] wanted me to call and thank you." Schuman replied, "Oh, I hope everybody has a good time."

116.    On or about April 6, 2008, Kelley, DIMORA, Russo, and PE55 boarded a Continental Airlines flight from Cleveland to Las Vegas.

117.    On or about April 9, 2008, Schuman asked Kelley if he was back in town. Kelley confirmed he flew from Las Vegas on "the red eye" the previous night. Schuman then said, "Come on down to the Agency tomorrow. I got the rest of your money." Kelley replied, "Oh beautiful. I appreciate it sir."

118.    On or about April 14, 2008, Kelley and Schuman discussed the Las Vegas trip. Schuman then confirmed that Kelley had picked up his check from AA and inquired, "We're all square right?" Kelley explained that one month remained at the increased rate before returning to the regular rate.

119.    On or about April 14, 2008, DIMORA told PE11 that he wanted to know when the meeting about the halfway houses, which was originally scheduled for April 8 but was canceled, was taking place. DIMORA told PE11 he wanted to put the new date on his (DIMORA's) schedule "'cause I wanted to go to it and this way I can pass it on to those halfway house people." DIMORA said a judge arranged the meeting through another County employee and, "I don't want to miss it."

20

120.    On or about April 17, 2008, the County Commissioners, with DIMORA voting in favor, approved a $250,000 contract with AA for residential facilities for the work release program.

121.    On or about April 22, 2008, Schuman and Kelley discussed AA receiving the County contract.

122.    On or about May 12, 2008, PE23 told DIMORA that the meeting with the halfway houses and the Court was scheduled the following day at 12:30. DIMORA explained that he will say that the judges were overlooking halfway houses as an alternative to jail.

123.    On or about May 13, 2008, Kelley told Schuman that they were confirmed for Thursday at Delmonico's restaurant. Kelley wanted to start working on the Sheriff's line item and suggested that they discuss it Thursday. Kelley told Schuman that he would pick up his consulting check from AA so that he could pay for Thursday's dinner.

EXECUTION OF THE SCHEME

124.    On or about the dates listed below, in the Northern District of Ohio and elsewhere, DIMORA, Russo Kelley, Schuman, Attorney 1 and others, for the purpose of executing the above-described scheme and artifice, caused documents to be delivered and sent through the United States mails, including invoices from AA in Cleveland, Ohio, to the County in Cleveland, Ohio, and payments from the County to AA in satisfaction of those invoices, including the following:

21

| Date | Description | Approximate Amount |
|------|-------------|--------------------|
| May 19, 2008 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for April 2008 Work Release | $4,705.30 |
| June 19, 2008 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for May 2008 Work Release | $15,781.29 |
| July 17, 2008 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for June 2008 Work Release | $24,113.56 |
| August 14, 2008 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for July 2008 Work Release | $28,593.44 |
| September 25, 2008 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for August 2008 Work Release | $39,813.97 |
| October 27, 2008 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for September 2008 Work Release | $47,974.17 |
| November 20, 2008 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for October 2008 Work Release | $49,382.63 |
| December 15, 2008 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for November 2008 Work Release | $41,555.14 |

| January 20, 2009 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for December 2008 Work Release | $2,785.80 |
|---|---|---|

All in violation of Title 18, United States Code, Section 1349.

The Grand Jury further charges:

## COUNT 2
### (Hobbs Act Conspiracy, 18 U.S.C. § 1951)

125.    Paragraphs 1-6, 12-13, 28-29, 34, 67 and 76 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

126.    Beginning in or about November 2007 and continuing until in or about May 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA, and Frank P. Russo (not charged herein), John Kevin Kelley (not charged herein), Brian Schuman (not charged herein) and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, namely, travel from Cleveland, Ohio, to Las Vegas, Nevada, for DIMORA, Russo, and PE55, and a Delmonico's restaurant dinner party valued at approximately $826, from AA, with its consent, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

23

The Grand Jury further charges:

## COUNT 3
(Conspiracy to Commit Bribery Concerning Programs Receiving Federal Funds,
18 U.S.C. § 371)

127.    Paragraphs 1-3, 27-30, 34, 37-39, 47-52, 54, 66-67, 72 and 81 of this Indictment are re-alleged and  incorporated by reference as if fully set forth herein.

## INTRODUCTION

### HUD-funded County Grant to City of Berea

128.    Beginning in or about the mid-1990's, Ferris Kleem engaged in a series of fund raising efforts to benefit the City of Berea.  In approximately 2006 and early 2007, and at Kleem's request, DIMORA and Russo used their influence to assist the City of Berea in obtaining a $150,000 grant funded by the United States Department of Housing and Urban Development ("HUD") and awarded by the County for the Coe Lake Nature Trail and Bridge Project.

### The Juvenile Justice Center Project

129.    In or around 2006, the County Commissioners approved construction of a new Juvenile Justice Center at East 93rd Street and Quincy Avenue in Cleveland, Ohio, at an estimated cost of approximately $160 million (hereinafter "JJC project").

130.    On or about December 13, 2007, the County Commissioners issued requests for proposals ("RFPs") for various portions of the JJC project.  Blaze Building sought the General Trades portion of the JJC project budgeted at approximately $22.6 million.  Phoenix Cement sought the concrete portion of the project valued at approximately $4.6 million.

24

131.    Phoenix Cement was the low bidder on the concrete portion and on or about March 20, 2008, received the $4.6 million contract.

132.    On or about March 20, 2008, the County Commissioners voted to reject all bids received for the general trades portion of the JJC project and ordered it be rebid with revised specifications and estimates.

133.    On or about April 3, 2008, the County Commissioners approved an addendum to the general trades portion of the JJC project, making technical changes and changing the estimated cost from $36,800,000 to $37,000,000.

134.    On or about April 7, 2008, the bids for the general trades were opened.  Blaze Building bid approximately $38 million but was the second lowest bidder and did not receive the contract, which was awarded to the low bidder on or about April 24, 2008.

The Snow Road Project

135.    In or about October 2007, the Engineer's Office issued an RFP for resurfacing Snow Road from Ridge Road to Broadview Road in the City of Parma.

136.    On or about May 1, 2008, Blaze Construction, the low bidder, obtained a contract valued at approximately $2,887,359 to resurface Snow Road ("Snow Road Project").

137.    The County paid Blaze Construction approximately $3.5 million for the Snow Road Project, after approved change orders.

BE13 and Business 22

138.    In the Spring of 2006, DIMORA and Russo urged Kleem to enroll his employees in Business 22.  Thereafter, the employees of two of Kleem's companies enrolled in Business 22.

25

In the next enrollment period in Spring 2008, DIMORA and Russo urged Kleem to retain his two companies' enrollment in Business 22 and also urged Kleem to persuade PO7 to switch PO7's employees to Business 22. Russo and DIMORA indicated that Kleem owed it to them because DIMORA and Russo had backed PO7 in a political campaign.

Federal Funds

139.    The County was a government agency as that term is defined in Title 18, United States Code, Section 666(d)(2), that received benefits in excess of $10,000 during the years May 31, 2006, through May 30, 2007, and May 31, 2007, through May 30, 2008, under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance and other form of Federal assistance.

THE CONSPIRACY

140.    From in or about Fall 2006 and continuing through on or about May 23, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA, and Frank P. Russo (not charged herein), Ferris Kleem (not charged herein), John Kevin Kelley (not charged herein), and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to commit an offense against the United States, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 666(a)(2).

OBJECTS OF THE CONSPIRACY

141.    It was an object of the conspiracy that DIMORA and Kelley, with Russo's assistance, corruptly solicited, demanded and accepted things of value for the benefit of any

26

person from Kleem and the companies in which Kleem had an interest, DIMORA, Kelley and Russo acting with the intent that DIMORA and Kelley be influenced and rewarded in connection with a business, transaction and series of transactions of the County valued at $5,000 or more in the years May 31, 2006, to May 30, 2007, and May 31, 2007, to May 30, 2008; that is, the award and administration of County business, both as requested and as future opportunities arose.  The things of value included, among others, cash, tangible items, entertainment for DIMORA, Kelley, Russo and their friends, including PE55, and business opportunities for BE13 and Business 22.

142.    It was a further object of the conspiracy that Kleem and the companies in which Kleem had an interest corruptly gave, offered and agreed to give to DIMORA and Kelley things of value, acting with the intent to influence and reward DIMORA and Kelley in connection with the business, transaction and series of transactions alleged in paragraph 141.

<u>MANNER AND MEANS</u>

It was part of the conspiracy that:

143.    Russo and DIMORA sometimes shared information about things of value they received and favors they performed in return.

144.    Kleem, knowing of the close political, professional and personal relationship of DIMORA and Russo, provided things of value to both DIMORA and Russo, believing that providing a thing of value to one tended to influence the other.

145.    Russo, knowing that DIMORA and he had received things of value from Kleem, corruptly encouraged DIMORA to perform official acts to benefit Kleem and Kleem's interests.

27

146.    From approximately late 2006 to approximately early 2008, DIMORA, Russo and Kleem had several conversations about Kleem entertaining DIMORA and Russo in Las Vegas.

## OVERT ACTS

147.    In furtherance of the conspiracy, and to effect the objects thereof, DIMORA, Russo, Kelley, Kleem and others committed the following overt acts in the Northern District of Ohio and elsewhere:

A.    In or around Spring or Summer of 2006, Kleem asked DIMORA and Russo to assist him in obtaining a HUD-funded County grant for the City of Berea to build a pedestrian bridge connecting a nature trail to a pavilion on Coe Lake.

B.    In or around Spring or Summer 2006, DIMORA, in the presence of Russo and Kleem, called PE52 in an effort to expedite Berea's application for the grant.

C.    Shortly before November 29, 2006, DIMORA and Kleem agreed that (1) Kleem would purchase a refrigerator valued at approximately $1,150 and have it delivered to the DIMORA residence, (2) Kleem would give DIMORA approximately $1,150 in cash and (3) Kleem would send DIMORA an invoice for the refrigerator.

D.    On or about November 29, 2006, Kleem caused FJR Properties, Ltd. to purchase the refrigerator and deliver it to the DIMORA residence.

E.    On or about December 11, 2006, or December 12, 2006, Kleem contributed approximately $1,500 to $2,000 in cash toward DIMORA's purchase of a $6,260 Rolex watch.

28

F.      On or about December 27, 2006, Kleem caused FJR Properties Ltd. to send DIMORA an invoice for the refrigerator, which DIMORA did not pay.

G.      On or about February 1, 2007, DIMORA voted to award a HUD-funded $150,000 grant to the City of Berea for the Coe Lake Nature Trail and Bridge Project.

H.      In or around Spring or Summer 2007, and at Kleem's request, DIMORA called a representative of First Energy and requested that First Energy expedite turning on the power at an apartment building FJR Properties had just completed building on Bagley Road in Berea, Ohio.

I.      On or about July 19, 2007, KLEEM entertained DIMORA and Russo at the Trout Club.

J.      In or about February 2008, Kleem asked DIMORA to assist Kleem's relative with a smoking violation citation Kleem's relative had received at his restaurant during a fundraiser at which Russo had been smoking.

K.      On or about February 11, 2008, DIMORA asked PE15 to "intervene" on the smoking violation.  DIMORA explained that the owner of the restaurant was a "big contractor," and "a friend of [Russo] and mine."  DIMORA also mentioned that Russo and he were at the restaurant when the citation was issued.  DIMORA gave PE15 Kleem's cellular telephone number and the restaurant's address and asked PE15 to call Kleem.  DIMORA indicated he thought the restaurant was in compliance, but DIMORA admitted he was not familiar with the laws.  DIMORA then told PE15 that Russo also asked DIMORA to call PE15 about the citation.  PE15 agreed to speak with Kleem and "sort it out."  DIMORA said he would

29

let Kleem know that DIMORA had talked to PE15.

    L.  On or about February 22, 2008 at approximately 2:15 p.m., Kelley had a telephone conversation with Kleem in which Kelley said he was with DIMORA and Russo and further said, "We are putting a little trip to Vegas together." Kleem replied, "Are we?" Kelley responded in the affirmative and asked Kleem to join them. Kelley provided Kleem with the dates of the trip and the names of those going, including Kelley, DIMORA, and Russo. When Kleem replied that he was "definitely in" for the trip, Kelley told Kleem, "Hold on, DIMORA wants to talk to you." DIMORA asked Kleem about a smoking citation which had been issued at Kleem's brother's restaurant and whether [UI] helped Kleem. Kleem replied, "Oh yes." DIMORA then stated, "I just wanted to make sure he treated you right." Kleem responded, "He definitely did." Kleem then told DIMORA that he was "excited about this April trip" and asked if DIMORA had booked his flight. DIMORA replied, "No, they are going to book it this week I guess." Kleem asked, "Do you want to be on the same plane with everybody or do you want me to take care of some things?" DIMORA and Kleem discussed traveling for personal reasons and staying at the Mirage Hotel and Casino in Las Vegas. Kleem said, "I will get everybody, tell everybody, tell them to use my name and then I don't have to get involved and everybody gets the casino rate, okay." Dimora replied, "Okay." Kleem continued, "They will get the lowest rate and you and Frank [Russo], I will take care of you with a suite." Kleem added, "When I see you, we'll talk." The conversation then turned to the JJC project. Kleem told DIMORA, "You know this Juvenile Justice Center, it is way over budget on the general trades." DIMORA replied, "It is?" Kleem said, "It is going to be $35 million, [DIMORA], instead of $22 [million]. You going

30

to be able to award it to me if I am low?" DIMORA responded, "Yeah."

      M.     On or about February 22, 2008 at approximately 3:16 p.m., Kleem and DIMORA had a telephone conversation in which Kleem told DIMORA that Blaze Construction was about $10 million over budget on the JJC project. DIMORA responded, "Okay. There was nobody lower?" Kleem said, "Yeah . . . we're low, we're low." DIMORA said, "Oh you're the lowest, good." Kleem and DIMORA then discussed details of the bids. DIMORA said, "I'm gonna get a copy of the bids." Kleem also told DIMORA that his other company, Phoenix Cement, was the low bidder on the concrete portion of the JJC project and would not be an issue. DIMORA replied, "No headache there."

      N.     On or about February 26, 2008 at approximately 3:41 p.m., DIMORA told Russo, "[Blaze Construction's] bid is f--ked up. Did you ever hear of anything like this? He submits a $35 million bid and he only puts a [sic] $30 million bond." DIMORA and Russo discussed how the Prosecutor's Office would have to decide whether to accept or reject Blaze Construction's bid. Russo asked DIMORA which company was competing against Blaze Construction. DIMORA told him and Russo replied, "Ohhh, try everything to give it to him [Blaze Construction]." Russo then suggested DIMORA call Kleem and tell him to be "proactive" and explain it was just a "clerical error." DIMORA and Russo then discussed the fact that Kleem, through Phoenix Cement, was the low bidder on the concrete portion of the JJC project. DIMORA said, "I don't even know why they do stupid things these guys. . . . Don't even, I mean why do you subject yourself to the risk of the problem unless he can't get the 35 million bond." Later in the conversation, DIMORA and Russo discussed other companies that

bid for different portions of the JJC project but were not the lowest bidders. DIMORA complained there was not much he could do because he would have to explain to the other County officials why they were not accepting the lowest bid. Russo said, "I tell all these guys - go in low and just add a thing or two on as you go along." DIMORA responded, "Yeah." Russo said, "But they don't listen." DIMORA replied, "No."

        O.      On or about March 10, 2008 at approximately 11:41 a.m., Kelley and Kleem had a conversation about the Las Vegas trip. Kelley informed Kleem that DIMORA and Russo only wanted a select group of people to travel with them to Las Vegas because "they [DIMORA and Russo] were afraid about too many people knowing too much about what we are doing." Kleem indicated he would have his secretary "book" all the hotel rooms. Kleem then asked Kelley who was "taking care of the travel." Kelley responded by telling Kleem it was up to him how Kleem wanted to handle the travel. Kelley also informed Kleem that DIMORA and Russo were traveling first class and asked, "If you want to do that, you know, I can book that for you if you want." Kleem replied, "Absolutely. I can take care of that, that's not a problem. I, I need to know the times and the dates and tell [my secretary] I'll talk to my travel agent and I'll get it arranged, but you know we got to work it out in a certain way, you know that – right?" Kelley replied, "Yeah, absolutely."

        P.      On or about March 10, 2008 at approximately 3:35 p.m., DIMORA, Kelley and GABOR had a conversation about the Las Vegas trip in which DIMORA confirmed he was working with Kleem and that everything would be fine with the room.

32

Q.     On or about March 10, 2008 at approximately 3:58 p.m., DIMORA and Kelley had a conversation in which they discussed the possibility that Russo might not go to Las Vegas. Kelley said, "He [Russo] ain't passing up Vegas, especially with Ferris [Kleem] gonna be there. He's [Russo's] already got Ferris convinced that he's got him ten jobs lined up." DIMORA replied, "Yeah."

R.     On or about March 20, 2008, DIMORA voted to award Phoenix Cement a contract valued at approximately $4,576,000 for the concrete portion of the JJC project.

S.     On or about March 25, 2008 at approximately 9:04 p.m., Kelley and DIMORA spoke about the need to give Kleem's secretary a list of people who needed hotel rooms at the Mirage. DIMORA then informed Kelley that DIMORA and Russo had a lunch scheduled with Kleem on April 1st or April 2nd. DIMORA agreed to speak to Kleem about the rooms during that lunch.

T.     On or about March 26, 2008, Kelley and Russo spoke about their upcoming trip to Las Vegas. Russo said, "I can't wait." Russo confirmed he was meeting with Kleem before the trip. Kelley and Russo then spoke about their hotel rooms in Las Vegas and whether the reservations were "all set." Russo said he would speak to Kleem about the rooms and "get it all organized."

U.     On or about April 1, 2008, Russo spoke with BE13 about his upcoming lunch with Kleem and DIMORA. BE13 asked Russo to make sure "we keep the MCOs at his [Kleem's] personal companies and [PO7] in Berea is what we are really looking for." Russo confirmed, "We want to keep his [Kleem's] MCOs and we want to get . . . what is the kid's name

33

out there, [PO7]?"  BE13 gave Russo the name and indicated he had met with PO7 already but "I think [PO7] may need a push from you know who."  Russo said, "We got to get that one out there, you know what I mean."

      V.     On or about April 2, 2008, Kleem met with DIMORA and Russo at Teamz Restaurant to discuss the Las Vegas trip.  During the meeting, Kleem gave DIMORA and Russo each an envelope containing $6,000 in cash; $1,000 each for their airfare to Las Vegas, and $5,000 each for gambling, the latter to insure that DIMORA and Russo each gambled enough to earn the "comped" suites at the Mirage that Kleem had reserved.

      W.    On or about April 2, 2008 at approximately 1:50 p.m., during the Teamz lunch described above, Russo received a call from BE13.  Russo told BE13 that DIMORA and he were still at lunch with Kleem.  BE13 asked Russo, "Will you true up with that stuff I talked to you about with his companies and that other thing."  Russo replied, "Absolutely."  BE13 told Russo that he was "heading to that office [Business 22] and they [BE15 and BE16] are going to be drilling me."  Russo said, "Tell them JIMMY and I are still at lunch with him now and we are going to try to keep those, plus get more plus . . . [PO7] will definitely take care of us."  Russo said, "JIMMY took care of us, they [Kleem and PO7] got no choice."  Russo said to DIMORA in the background, "JIM, remind me before we leave about something over here with the city."  DIMORA replied, "Berea city."  Russo said, "Yeah, okay with [BE15]."  Russo confirmed that BE13 had already talked to PO7 once.  BE13 responded that he already talked to PO7 and was supposed to get back to [PO7] by May 1st, but "you know . . . little bit a little little little message that's all."  Russo responded, "Okay."

X.      On or about April 2, 2008 at approximately 3:00 p.m., Russo left the following voice mail message for BE13: "[I]t's about ten to three. My luncheon is over. Everything worked out good. He [Ferris Kleem] said he was going to talk to [PO7]. And his accounts are still stable so everything's fine. I'll call ya on the cell."

Y.      On or about April 2, 2008 at approximately 3:45 p.m., during the Teamz lunch described above, Kleem told DIMORA he was having trouble determining whether he had obtained a taxi-way contract on which he had bid at Cleveland Hopkins International Airport. DIMORA called PO6, stating that he was "sitting with a good friend of ours, Ferris Kleem." DIMORA asked PO6 about the status of the taxi-way project, for which Blaze Construction was the low bidder. Kleem then began speaking on DIMORA's telephone. Kleem told PO6, "We bid it about a month and a half ago, six, maybe eight weeks ago now and it's just been going around and I can't get no answers from down there." PO6 stated, "That's a phone call away," and confirmed the name of the project. PO6 asked, "Should I call you directly or just call JIMMY [DIMORA]?" Kleem provided PO6 with his cell phone number for a direct call back. PO6 stated, "I won't specifically ask for you [Kleem], I'll just say, 'What's the status of everything in . . . if everything is in place, would it be a proper assumption that the low bid would get it?'" PO6 also told Kleem that he would obtain information about the "timing" of the contract award.

Z.      On or about April 2, 2008 at approximately 4:20 p.m., and after the Teamz lunch, Russo and DIMORA discussed their meeting with Ferris Kleem. DIMORA stated, "He [Kleem] made me sick with ten more f---ing issues." Russo replied, "You should have left when I left."

35

AA.    On or about April 2, 2008 at approximately 9:35 p.m., PO6 informed DIMORA, "I took care of Ferris [Kleem] a little bit if that's all right." DIMORA replied, "Oh, that's fine." PO6 then informed DIMORA that Kleem was the low bidder and he was going to receive the job. DIMORA confirmed Kleem would receive the contract and stated, "Oh that's good." PO6 then said, "You [DIMORA] helped deliver but it was going to go his way but we just gave him the timing." DIMORA replied, "He [Kleem] said he was the low bidder but he thought they were trying to take it away from him." PO6 then informed DIMORA that PO6's call should be helpful and the contract should be awarded to the lowest bid. PO6 added, "So if they are going to f--k around with him [Kleem] now, they know that I called. I didn't say anything about you [DIMORA]." DIMORA stated, "He [Kleem] says he sends you [PO6] money." PO6 replied, "Minimal."

BB.    On or about April 3, 2008, Russo and Michael D. Gabor had a conversation in which Russo said, "Don't say anything, but we just met with the one guy [Kleem] who's going to be there [in Las Vegas], he's gonna have whores and he's got a tiki hut by the pool, he's got everything." Gabor replied, "I heard. That's a beautiful thing, that's awesome." Russo continued, "Monday night we're going to dinner at this great restaurant there." Gabor said, "Yeah, that's awesome." Russo added, "It is going to be a nice time." Gabor then confirmed Russo received his "package [itinerary]." Gabor told Russo it was his (Gabor's) decision to put it in an envelope because it was "nobody's business." Russo replied, "I paid Kevin [Kelley]. I did not want anybody to say they paid for our tickets. So JIMMY [DIMORA] and I gave him a check today for our tickets because I didn't want no rumors to start that Kevin

36

[Kelley] took us to Vegas or that other guy [Kleem] took us to Vegas. This way we got proof we paid our own tickets and I have no problem then. You know what I mean." GABOR responded, "Absolutely. F--k it. This was what . . . you got the check, it's done."

      CC.    On or about April 6, 2008, Kleem called DIMORA and asked if DIMORA found the limousine driver who was waiting for DIMORA at the Las Vegas airport. Kleem told DIMORA to check in as a VIP at the Mirage.

      DD.    Starting on or about April 6, 2008, Kleem gave DIMORA gaming chips valued at approximately $3,500.

      EE.    On or about April 7, 2008 at approximately 3:31 p.m.,[1] DIMORA had a telephone conversation with PE11 about the JJC project bids. DIMORA asked PE11 whether the low bidder had included a $3.5 million allowance. DIMORA explained that if the low bidder had not included the allowance, its bid would not be low. DIMORA asked PE11 to find out and to call DIMORA back. DIMORA emphasized it was "important."

      FF.    On or about April 7, 2008 at approximately 3:44 p.m., PE11 called DIMORA back. PE11 explained the bid specifications to DIMORA, which made Blaze Construction the second lowest bidder. PE11 also informed DIMORA that he had spoken to PE10 to ascertain whether the lowest bidder had fulfilled its SBE requirement. DIMORA instructed PE11 to speak to Kleem directly to make sure "we're talking apples to apples." DIMORA then handed the telephone to Kleem. Kleem inquired whether the low bidder included

---

[1]All times mentioned in this Indictment are Eastern Time, even when describing conduct occurring outside the Northern District of Ohio.

the $3.5 million allowance in its bid.  PE11 agreed to ask other County employees to find an answer for Kleem.

GG.    On or about April 7, 2008 at approximately 8:11 p.m., DIMORA told Kleem that Kleem had "missed all of the crazy antics" at the Bare pool after Kleem left.  Kleem asked, "What happened?"  Dimora then explained what happened at the Bare pool.  Dimora then indicated, "They had a lot of laughs."  Kleem said, "That's good.  I'm glad you had a good time." DIMORA replied, "Oh we laughed we laughed.  The hottest broad was the one in the red, the server.  Ohhh. . . ."  Kleem later said, "The girl . . . my friend here - she looks kinda like that except she dyed her hair blonde, that's the only difference.  She would come up . . . she's in f---ing California.  I couldn't f---ing believe it . . . . That's the one I was going to send to your room."  DIMORA said, "Well, hopefully [the casino host] can come up with somebody."  Kleem replied, "Yeah we'll, don't worry.  We'll come up with somebody tonight.  Don't worry, I'll make some calls.  I know some other broads here."  Dimora and Kleem later agreed to meet at the poker table.

HH.    On or about April 8, 2008 at approximately 11:10 a.m., DIMORA called PE11.  DIMORA said, "This Ferris Kleem is down here at the . . . ."  PE11 indicated he spoke with PE10 about the "$3.5 million thing," and PE10 was confused about what it meant so PE11 needed to speak with PE13.  DIMORA said, "I don't even know what he [Kleem] is talking about, but he comes to get me, you know of all things these people, some of these people that are down here from Cleveland.  Uh, so he's [Kleem] down here.  He [Kleem] comes and grabs me with this nonsense.  I says, 'Ferris I don't know anything about it let me call PE11 and I will let

38

you talk to PE11 direct.'" PE11 again indicated he wanted to talk to PE13 about the issue.

DIMORA then instructed PE11 to call Kleem back on Kleem's cell phone and "see if you can't . .

. give him. I don't know what answer he is looking for." DIMORA and PE11 then spoke about

potential "SBE issues" which might exist with the low bidder. DIMORA told PE11 he never

spoke to Kleem about the "SBE issues." PE11 responded by telling DIMORA that PE11 would

not say anything about the SBE issues when he spoke to Kleem.

II.     On or about April 8, 2008 at approximately 7:02 p.m., Kleem, while

sitting at a gaming table with DIMORA and others, received a telephone call from the casino

host, who provided Kleem with the name and telephone number for a woman. Kleem wrote the

woman's first name on a piece of paper along with a telephone number.

JJ.     Shortly after on or about April 8, 2008 at approximately 7:02 p.m., Kleem

placed a telephone call to the woman to solicit her services for DIMORA.

KK.     On April 8, 2008 at approximately 9:40 p.m., Kleem met the woman

described above at a bar in the Mirage Hotel and Casino, escorted the woman to his hotel room

and paid her approximately $1,000 in cash for the purposes of servicing DIMORA.

LL.     On or about April 8, 2008 at approximately 9:46 p.m., Kleem called

DIMORA to say that he was trying to bring the woman Kleem had hired up to DIMORA's room.

DIMORA confirmed his room number was C-56 and said, "This girl. . . Give me a massage and

that? Is that what she does and then . . ." The call dropped and DIMORA called back and asked,

"I just said, she gives a massage. Is that how we're going to start her out?" Kleem responded,

"It's yeah, don't worry. I'll be there in a minute."

MM.    On or about April 9, 2008 at approximately 12:44 a.m., DIMORA called Kleem and thanked him.  Kleem asked DIMORA, "Was that the best or what?"  DIMORA said, "Yeah, she's good, a little chatty, but good."  DIMORA and Kleem then agreed to meet at the Chinese restaurant in the Mirage.  At the end of the conversation DIMORA said, "Thank you though.  It was excellent.  Thank you, thank you."  Kleem replied, "No problem buddy."

NN.    On or about April 9, 2008 at approximately 1:35 a.m., while at the Chinese Restaurant in the Mirage, Kleem asked DIMORA to have a certain inspector at the Engineer's Office assigned to the Snow Road project.  DIMORA agreed to use his influence to have the inspector assigned to the Snow Road project.

OO.    On or about April 9, 2008 at approximately 12:10 p.m., DIMORA called Russo to inquire about Russo's return flight from Las Vegas.  Russo described his flight and then asked DIMORA, "Where the hell were you last night?  We waited til 9:30. . . ."  DIMORA replied, "I had a masseuse come over to the room and, uh. . . . "  Russo and DIMORA then had a lengthy discussion about the charges on Russo's bill from the Mirage.  Russo said, "I lost money. Don't say nothing but my room was $900 and [the casino host] wouldn't do any different but you know we had it to pay so. . . . "  DIMORA said, "What."  Russo continued, "Yeah.  Remember he [Kleem] said don't tell Kevin [Kelley] or anybody what the bill is because he gave us money for the bill too."  DIMORA then inquired, "You didn't have to pay it did you?"  Russo informed DIMORA he put the bill on his credit card and suggested DIMORA would also be charged for his room.  DIMORA expressed surprise that he might be charged.  Russo then said, "I didn't want to say it in front of Kevin [Kelley] because remember 'cause he [Kleem] said don't say nothing in

40

front of Kevin.  So when Kevin said, 'Is your room taken care of?' I just looked at him and said, 'Yeah.'"  DIMORA asked if Russo spoke with the casino host.  Russo said, "Yeah. They called him up and he said nope they already got their discount they know the story . . . the two suites. So. . . . "  DIMORA said, "Oh.  No s--t we got to pay $900?"  Russo and DIMORA then discussed how PE55 had room service charges and how DIMORA's hotel bill may be less since DIMORA did not order room service.  Russo then suggested some of the others may have charged things to his room and to DIMORA's room.  Russo told DIMORA he was with the others the previous night at the Chinese restaurant when the bill came, "Kevin [Kelley] goes f--k 'em. You guys [Russo and DIMORA] are getting all your s--t."  DIMORA and Russo then discussed how Kelley and Pumper both received free rooms.  DIMORA said, "Yeah.  I don't know.  Ferris [Kleem] told me, he said, 'Oh, your room should be free you know, you played enough, you were playing $100.'  They were telling me I averaged $100 a hand.  And I don't know how many hours they had me down."  Russo then complained, "Well I lost six thousand f-- ing dollars in black and white.  They seen it."  DIMORA then inquired if the money Russo lost appeared on his Player's Club account.  Russo confirmed the money he lost was reflected on his account and said he was told by a casino worker, "Nah, that ain't enough for the big suites." DIMORA was surprised Russo did not receive anything from the Mirage based on the amount of money Russo spent gambling.  Russo replied he only received the "casino rate."  Russo then added,  "Yeah, so they charged $911 on my charge but I am not going to argue with the girl.  I said I'll pay."  DIMORA replied, "Yeah."  Russo continued, "Because we had the money to pay for it.  It isn't like . . . you know what I mean."  DIMORA agreed.  Russo again suggested

41

DIMORA would be charged for his suite and told DIMORA, "Just throw it on your charge and be done." Russo then added, "Just don't say nothing to anybody 'cause I don't want . . . 'cause if I would have told Kevin [Kelley] he would have made a thing and 'cause remember he [Kleem] told us, 'Don't say nothing about the room,' remember." DIMORA replied, "Yeah." Russo then said, "'Cause that's why I don't want to get nobody in hot water." DIMORA and Russo then discussed the logistics of checking out of the Mirage. DIMORA questioned whether he should speak to the casino host. Russo responded, "Yeah you better, [DIMORA], unless you want to have $600 on your charge."

    PP.  On or about April 9, 2008 at approximately 1:26 p.m., Kleem, while at the Las Vegas Airport, called DIMORA, who was at the Mirage. Kleem told DIMORA he had heard PE10 was going to recommend throwing out the low bid for the JJC project general trades contract. DIMORA inquired whether the low bid was going to be disqualified because of the SBE. Kleem replied, "Yeah." DIMORA then confirmed he had previously heard some rumblings that the SBE used by the low bidder was "questionable." Kleem then added that the SBE subcontract was also unsigned. DIMORA said, "We threw out the same thing for the fire suppression system," referring to an unsigned SBE. DIMORA later added, "Well, that's good news for you [referring to the possibility that Kleem's higher bid might be accepted]." Kleem responded, "Yeah, it is." DIMORA then offered to have PE11 make some inquiries about the questionable SBE and call Kleem back. Kleem informed DIMORA he (Kleem) was boarding a plane in fifteen minutes and suggested they talk when they returned to Cleveland. Kleem also said, "I just wanted to let you know, see if there was anything you know, you could do."

DIMORA indicated he would check with PE11 to see what was going on with the bid.
DIMORA also told Kleem that he (DIMORA) was going to meet with the Mirage marketing host
to check out.  DIMORA informed Kleem that the Mirage charged Russo for his suite.  Kleem
replied, "Yeah, yeah, I'll take care of him [Russo], don't worry just whatever, whatever we got to
do."  DIMORA then suggested he would not be charged for his room because he "gambled pretty
heavy on every day."  Kleem replied, "I think you're fine.  I think you're fine."  DIMORA added,
"I think he [Russo] also charged a bunch of s–t to his room."  Kleem replied, "Yeah, we'll take
care of it, don't worry."  DIMORA again offered to "check on that other thing [the low bid on the
JJC project]."  DIMORA and Kleem agreed they had a great time in Las Vegas.  DIMORA said,
"It was a f---ing blast."  Kleem replied, "Ohhh . . . It was the bomb.  We got to do it again."
DIMORA said, "We were all just saying what a f---ing great time we all had.  We appreciate
your hospitality and your generosity.  That's very nice of you."  DIMORA concluded the
conversation by telling Kleem, "Well, I'm going to keep my fingers crossed for you.  That [the
JJC project] would be a good thing for you."

       QQ.    On or about April 10, 2008 at approximately 11:05 a.m., Kelley thanked
Kleem for everything in Las Vegas and informed Kleem that he (Kelley) owed Kleem money.
Kleem responded, "I don't want to hear that anymore, just take care of me some time and do
something."  Kelley replied, "Well, you know that, that goes without saying."  Kleem then told
Kelley the name of the inspector Kleem wanted assigned to the Snow Road Project.  Kelley told
Kleem, "Okay, that's good, I'll call you right back okay, let me get started on that right now."

RR.    On or about April 10, 2008 at approximately 11:14 a.m., Kelley and Kleem had a second telephone conversation in which Kelley recounted a conversation Kelley had with PE1. Kelley said PE1 had not been receptive to Kleem's request that a certain inspector be assigned to the Snow Road project. In response, Kelley had invoked DIMORA's name and told PE1 that DIMORA wanted to do this for Kleem and suggested if PE1 could not "get it done," DIMORA would contact PO3 directly to make sure the inspector was assigned to the job. Once Kelley had said this to PE1, PE1 agreed to "look into" the situation.

SS.    On or about April 10, 2008 at approximately 4:13 p.m., DIMORA and Kelley had a telephone conversation in which they spoke about what a good time they had in Las Vegas. DIMORA jokingly said he put a picture of Kelley on the internet. Kelley responded that he is calling all their wives to tell them about what they did in Las Vegas. DIMORA said, "I just went one simple massage is all I had." Kelley joked that DIMORA was going to get "hives" all over his lips because of what he did with the "hooker." DIMORA replied, "If I get them, I am drinking out of everybody's cup when nobody is looking, so that everybody catches it so it is a common disease that we are all going to catch together." DIMORA then told Kelley that Russo had complained about DIMORA getting "comped" because Russo had to pay $900 for his room. Kelley suggested Russo had to pay because of all the clothes PE55 charged to Russo's room. At the end of the conversation DIMORA told Kelley, "Don't forget to talk to [PO3] about that guy [the inspector for Snow Road]." Kelley said, "I already did. I talked to [PE1] first." Kelley then added, "I talked to [PE1] and he was a little like, well, why didn't Ferris call me? So I called Ferris and I told him, I said, 'Ferris, you know I told [PE1] that we ran into [you]. I didn't tell

44

him where.' So I told Ferris, 'Just tell him [PE1] you ran into us and you told us not to say anything but we [Kelley and DIMORA] jumped on it too fast, you were going to call, wait a day or so and call him [PE1].' So I think it will all work out. If not, then I'll have to get you on the phone, me, you and [PO3] on a three way or something like that." DIMORA replied, "Alright. I saw [PO3] today. I should have said something to him." Kelley replied, "It will work itself out. It will all be fine." DIMORA added, "I mean it didn't sound like it is a big deal." Kelley replied, "It's not, but these f---ing guys, these people get power and . . . I'm hoping that PE1 does the right . . . I told him [PE1] what to do. I lead him [PE1] to it. Hopefully he [PE1] does it. If he doesn't then I'll have to go over his head." DIMORA replied, "Let me know if I need to do something because we got to do something. I mean he's [Kleem] not asking for anything ridiculous." Kelley said, "I know absolutely. I'll take care of it." DIMORA said, "We got to do that at least." Kelley added, "If it doesn't get taken care of, I'll call you, but it should be taken care of. I told [PE1] you [DIMORA] would consider it a personal favor if he [PE1] took care of this."

TT.    On or about April 10, 2008 at approximately 6:46 p.m., DIMORA and Gabor discussed the JJC bids.

UU.    On or about April 10, 2008 at approximately 8:14 p.m., DIMORA and Russo discussed a Plain Dealer reporter who called Russo about the Las Vegas trip. Russo and DIMORA agreed it was nobody's business about their personal trip to Las Vegas because the County did not pay for their trip. Russo said, "I am so glad I paid for my ticket." DIMORA replied, "You have to. They are going to check all that." DIMORA and Russo then complained

45

about the reporter wanting to know who was with them in Las Vegas.  DIMORA said, "I'm not

going to tell him [the Plain Dealer reporter] that I saw Ferris Kleem over there [in Las Vegas].

Russo replied, "No, no.  I would say I didn't see him.  DIMORA responded, "I'll say I saw a

bunch of people over there."  Russo said, "Whatever you do, don't mention his name JIM

[DIMORA]."

    VV. On or about April 15, 2008 at approximately 6:15p.m., DIMORA asked

Kelley, "Listen, did you get, take care of that guy with uhhh, that project, whatever the f--k his

name is?"  Kelley replied that he had spoken to Kleem earlier in the day, and that Kleem had

indicated everything was going well at the moment, but that Kleem would let Kelley know if

Kleem needed additional help.  DIMORA asked whether PE1 "took care of it."  Kelley said that

he was "pretty sure," but explained that Kleem instructed Kelley to "let it play out" because

Kleem had not yet been awarded the job.  DIMORA replied, "Okay, alright."

    WW. On or about April 17, 2008, Kleem told Kelley he was meeting PE1 and

PE14 for lunch later in the day.  Kelley responded, "Oh, beautiful.  Will you call me afterwards

and make sure it's all taken care of?"  Kleem said, "Yeah."  Kelley said, "'Cause JIMMY,

JIMMY [DIMORA] really wants to make sure this is done."

    XX. On or about May 1, 2008, DIMORA voted to award the Snow Road

resurfacing contract to Blaze Construction in the amount of approximately $2,887,359.

    YY. In approximately the Spring of 2008, as a result of Kelley's efforts and

DIMORA's influence, the inspector Kleem had requested was assigned to the Snow Road

project.

ZZ.    In approximately May 2008, and prior to May 23, 2008, DIMORA asked Kleem to assist DIMORA in purchasing a Rolex watch as a graduation gift for a relative of DIMORA.

AAA.    On or about May 28, 2008 at approximately 11:46 a.m., Kleem thanked DIMORA for the "message." DIMORA indicated everything was alright so far but he is "always waiting for the other shoe to fall or drop." Kleem replied, "Well there is no other shoe to drop. I think everything is going to be good." At the conclusion of the call, Kleem and DIMORA agreed to meet at a later date. Kleem told DIMORA, "Don't worry too much."

All in violation of Title 18, United States Code, Section 371.

The Grand Jury further charges:

COUNT 4
(Bribery Concerning Programs Receiving Federal Funds,
18 U.S.C. §§ 666(a)(1)(B) and 2)

148.    Paragraphs 1-3, 27-28, 47, 72, 81 and 128 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

149.    The County was a government agency as that term is defined in Title 18, United States Code, Section 666(d)(2), that received benefits in excess of $10,000 during the year May 31, 2006 through May 30, 2007 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance and other form of Federal assistance.

150.    Beginning on or about May 31, 2006 and continuing until on or about May 30, 2007, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA did corruptly solicit, demand, accept

and agree to accept for the benefit of any person things of value from Kleem, companies Kleem

controlled and entities over which Kleem had influence; namely, among other things, a

refrigerator, cash, meals in the Cleveland area, entertainment in Las Vegas for DIMORA and for

his friends, MCO business for BE13 and Business 22, a discount on a Rolex watch Kleem could

obtain because of his personal and business relationships with a jeweler, and other things of

value, DIMORA acting with the intent to be influenced and rewarded in connection with any

business, transaction and series of transactions of the County involving any thing of value of

$5,000 or more; that is, a HUD-funded $150,000 grant to the City of Berea for the Coe Lake

Nature Trail and Bridge Project and other County business as requested and as future

opportunities arose.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

The Grand Jury further charges:

COUNT 5
(Bribery Concerning Programs Receiving Federal Funds,
18 U.S.C. §§ 666(a)(1)(B) and 2)

151.     Paragraphs 1-3, 27-29, 38, 47-48, 72, 81 and 129-137 of this Indictment are re-

alleged and  incorporated by reference as if fully set forth herein.

152.     The County was a government agency as that term is defined in Title 18, United

States Code, Section 666(d)(2), that received benefits in excess of $10,000 during the year May

31, 2007 through May 30, 2008 under a Federal program involving a grant, contract, subsidy,

loan, guarantee, insurance and other form of Federal assistance.

48

153.    Beginning on or about May 31, 2007 and continuing through on or about May 30, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA, aided and abetted by Frank P. Russo (not charged herein) did corruptly solicit, demand, accept and agree to accept for the benefit of any person things of value from Kleem, companies Kleem controlled and entities over which Kleem had influence; namely, among other things, cash, meals in the Cleveland area, suites at the Mirage in Las Vegas, entertainment, meals and limousine service in Las Vegas, gaming chips, MCO business for BE13 and Business 22, and discounts on jewelry and appliances that Kleem could obtain because of his personal and business relationships with vendors, DIMORA and Russo acting with the intent that DIMORA be influenced and rewarded in connection with any business, transaction and series of transactions of the County involving any thing of value of $5,000 or more; that is, the JJC project, the Snow Road project, a smoking violation, access to PO6 and information about an airport contract, and other County business as requested and as future opportunities arose.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

The Grand Jury further charges:

## COUNT 6
### (Hobbs Act, 18 U.S.C. § 1951)

154.    Paragraphs 1-3, 5-6, 8, 27-28, 72-73 and 81 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

155.    From in or about Summer 2005 and continuing through on or about May 30, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA did knowingly obstruct, delay and affect and attempt to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is DIMORA obtained property not due to him or his office, namely among other things, cash, household appliances, meals in the Cleveland area, a suite at the Mirage in Las Vegas, entertainment, meals and limousine service in Las Vegas, gaming chips, MCO business for Business 22, a discounted television, and assistance with the purchase of a Rolex watch, from Ferris Kleem and the companies he controlled, with their consent, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

COUNT 7
(Hobbs Act Conspiracy, 18 U.S.C. § 1951)

156.    Paragraphs 1-3, 5-6, 8, 25, 28, 30, 34-36 and 71 of this Indictment are re-alleged and  incorporated by reference as if fully set forth herein.

INTRODUCTION

157.    In or about 2002, the Engineer's Office began looking for new office space. Gallagher, then employed by the County, participated in the office relocation project.

158.    In or around September of 2002, Gallagher retired and Payne assumed responsibility for the relocation project.

50

159.    In or around April of 2003, an RFP was issued for new office space for the Engineer's Office. Potential landlords, including a representative of Stonebridge, made presentations to the Engineer's Office.

160.    At various times during this conspiracy, Payne's law practice had a barter agreement by which Touch of Class ("TOC") provided Payne with limousine service and in return, Payne's law practice provided TOC with legal services.

## THE CONSPIRACY

161.    Beginning in or about February 2003 and continuing until in or about May 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA and John Kevin Kelley (not charged herein), Kevin F. Payne, (not charged herein), and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, namely, travel via limousine service, entertainment, and the use of a condominium, from Kevin Payne and Payne's law practice with their consent, under color of official right.

## OBJECT OF THE CONSPIRACY

162.    It was an object of the conspiracy that DIMORA obtained and attempted to obtain things of value from Payne and Payne's law practice, in return for DIMORA using his County position to benefit Payne and his designees.

51

## MANNER AND MEANS

It was part of the conspiracy that:

163.  Payne lobbied DIMORA to approve a lease for the Engineer's Office at the Stonebridge location.

164.  On several occasions between in or around 2003, through on or about June 29, 2007, Payne provided DIMORA and his family with free limousine service from TOC. For example, on or about May 9, 2003, Payne provided DIMORA with limousine service valued at approximately $480, and on or about June 1, 2003, Payne provided DIMORA with limousine service valued at approximately $160.

165.  On or about June 10, 2003, the County Commissioners, with DIMORA voting in favor, approved the Engineer's Office move to the Stonebridge location.

166.  On or about June 11, 2003, Payne provided DIMORA with limousine service valued at approximately $480.

167.  On or about August 1, 2003, the Engineer's Office entered into a ten-year lease for office space at Stonebridge. The lease fees totaled approximately $3,992,320 for the life of the lease, payable in monthly installments.

168.  On several occasions, Payne allowed DIMORA and DIMORA's friends access to a condominium at Stonebridge for their personal use, which condominium had been loaned to Payne by Business 5.

169.  On several occasions, Payne paid prostitutes to entertain and provide services to DIMORA. Payne also paid the travel expenses for the prostitutes.

52

170. On several occasions from in or around January 2005 through in or around May 2008, DIMORA assisted Payne in connection with obtaining the County Commissioners' approval of amendments to the County Sanitary Engineer's Office and Engineer's Office collective bargaining agreements with certain unions and salary matters for nonunion employees in the County Sanitary Engineer's Office.

171. On or about April 3, 2008 at approximately 5:35 p.m., Kelley told Payne that the Commissioner wanted to know if he had access to the unit across the way because he (the Commissioner) had a "Saturday night adventure" planned. Payne said that he would check the next day. DIMORA then started speaking with Payne. Payne and DIMORA discussed the condominium and matters Payne had pending before the County Commissioners.

172. On or about April 4, 2008 at approximately 11:03 a.m., Kelley told Payne that DIMORA wanted to know if he could use that condominium over the weekend. Payne said that the condominium was not there anymore, but that he could obtain a key to the new model.

173. On or about April 4, 2008 at approximately 11:09 a.m., Payne and Kelley discussed obtaining a condominium or other private location for DIMORA's use.

174. On or about April 4, 2008 at approximately 11:29 a.m., Kelley and DIMORA discussed arrangements for using a Stonebridge unit the following day. Kelley told DIMORA there were two options, a new model unit in a new building at Stonebridge or one of the suites at the Embassy Suites at Reserve Square. DIMORA and Kelley discussed the Embassy Suites option being too visible and discussed how to access the new the Stonebridge unit. Kelley said to DIMORA, "I still think you're crazy. I think I would wait until the f---ing the next day and just

53

get your f---ing c--k blown, you know." DIMORA replied, "Yeah, it's just some old friend that's all." Kelley agreed to set it up and said he would "get ahold of Payne" and work on getting the key.

175.    On or about April 4, 2008 at approximately 11:34 a.m., Kelley left a message for Payne that DIMORA preferred to use the model unit at Stonebridge.

176.    On or about April 4, 2008 at approximately 11:40 a.m., Payne returned Kelley's call and said that he left a message for [a Stonebridge agent] with DIMORA's decision and that the Stonebridge agent had not returned the call.

177.    On or about April 4, 2008 at approximately 12:02 p.m., Kelley and DIMORA discussed Kelley obtaining the key to the Stonebridge condominium from Payne.

178.    On or about April 4, 2008 at approximately 12:55 p.m., Payne told Kelley that the Stonebridge agent would drop off the key in an envelope at Payne's front desk. Payne also said he would pick it up and call Kelley. Kelley said that either Kelley or Payne could give it to DIMORA.

179.    On or about April 4, 2008 at approximately 6:29 p.m., Payne told Kelley that it was a big production, but he received keys to the model in the new building. Payne asked if DIMORA was going to drive himself there. Kelley said that he believed so. They discussed parking and directions to the unit. Payne said that he would deliver the key to DIMORA the next day.

180.    On or about April 4, 2008 at approximately 6:33 p.m., Kelley told DIMORA that Payne would call DIMORA the following day because Payne had "all the stuff." Kelley told

54

DIMORA to park on the bridge and walk to Unit 808.

181.    On or about April 5, 2008 at approximately 11:42 a.m., Payne asked DIMORA where he should deliver the key. Payne offered to drop it off at DIMORA's house. DIMORA asked Payne if it was okay over there at the new Stonebridge unit because Kelley kept saying "you know it's risky, risky." DIMORA said he told Kelley it was the same as it was before. Payne told DIMORA he checked it out the previous day and made sure all the keys worked. Payne said he would give the keys to Kelley if he was unable to meet DIMORA. DIMORA told Payne he would call him either way and said, "I appreciate your uh due diligence on this for me. Thank you. You're a good man. Thank you."

182.    On or about April 5, 2008 at approximately 3:07 p.m., DIMORA left a voice mail message for Kevin Payne asking him to meet DIMORA at DIMORA's house.

183.    On or about April 5, 2008 at approximately 4:47 p.m., Payne told DIMORA that he was en route to a birthday party with his daughter and was pulling into DIMORA's development. DIMORA told Payne that he would meet Payne outside.

184.    On or about April 16, 2008 at approximately 3:06 p.m., Kelley asked DIMORA if he still had the key to the condominium that Payne had given him. DIMORA said that he still had the key. Kelley said that they needed the key for poker the following night.

185.    On or about April 16, 2008 at approximately 5:41 p.m., Gabor and DIMORA confirmed that they were playing cards at Kevin Payne's condominium the following evening.

186.    On or about May 1, 2008 at 10:03 a.m., Kelley told DIMORA that Payne had an item on the Commissioners' agenda that day and would be there presenting.

55

187.    On or about May 1, 2008, the County Commissioners, DIMORA voting in favor, approved items related to the County Engineer/Sanitary Engineering Division.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

## COUNT 8
(Hobbs Act, 18 U.S.C. § 1951)

188.    Paragraphs 1-3, 5-6, 8, 28 and 35-36 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

189.    Beginning in or about February 2003 and continuing until in or about May 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA did knowingly obstruct, delay and affect and attempt to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, namely, travel via limousine, entertainment, and the use of a condominium, from Kevin Payne and Payne's law practice, with their consent, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

## COUNT 9
(Conspiracy to Commit Mail Fraud and Honest Services Mail Fraud, 18 U.S.C. §§ 1341 and 1346, in violation of 18 U.S.C. § 1349 )

190.    Paragraphs 1-3, 10, 26, 28-29, 32, 41-43, 52, 55, 60, 80 and 81 of this Indictment are re-alleged and  incorporated by reference as if fully set forth herein.

56

## THE CONSPIRACY

191.    From in or about 2006, and continuing through on or about July 18, 2008, the

exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division,

Defendants JAMES C. DIMORA and JERRY J. SKUHROVEC, and Frank P. Russo (not

charged herein) and others known and unknown to the Grand Jury, did knowingly and

intentionally combine, conspire, confederate and agree with each other to commit an offense

against the United States, namely, to knowingly devise and intend to devise a scheme and

artifice:

> (1) to defraud and deprive Cuyahoga County and its citizens of their right to the honest
>
> and faithful services of DIMORA and Russo, through bribery and kickbacks and the
>
> concealment of material information related thereto, and
>
> (2) to defraud Cuyahoga County, certain County property owners, and certain prospective
>
> property owners and to obtain money and property by means of materially false and
>
> fraudulent pretenses, representations and promises,

and for the purpose of executing such scheme and artifice, to cause matters to be placed in any

post office and authorized depository for mail matter to be sent and delivered by the United

States Postal Service and private and commercial interstate carrier, in violation of Title 18,

United States Code, Sections 1341 and 1346.

## OBJECT OF THE CONSPIRACY

192.    It was the object of the conspiracy that DIMORA, with Russo's assistance,

secretly used his official position to enrich himself and Russo, by soliciting and accepting gifts,

payments, and other things of value from SKUHROVEC, in exchange for favorable official action, and that SKUHROVEC enriched himself by secretly obtaining favorable official action for himself through corrupt means.

## MANNER AND MEANS

It was part of the conspiracy that:

193.    DIMORA and Russo solicited and accepted gifts, payments, and other things of value from SKUHROVEC, including food, entertainment, sponsoring a political fundraiser for PO11, and giving a personal economic advantage to Russo related to a foreclosed property.

194.    DIMORA, with Russo's assistance, provided favorable official action for the benefit of SKUHROVEC as requested and as opportunities arose, including helping PO12's relatives obtain and retain County employment, in return for future favors from PO12.

195.    The conspirators took steps to hide, conceal, and cover up their activity and the nature and scope of SKUHROVEC's dealings with DIMORA and Russo.

Acts in furtherance of the conspiracy

196.    Beginning in or about 2006, Russo contacted PE24 and inquired about JERRY SKUHROVEC being hired as an appraiser by the Sheriff's Office.

197.    Beginning in or about 2007, Russo and DIMORA asked PE24 if she could bend the rules for SKUHROVEC regarding the appraiser requirements, to which PE24 responded negatively.

198.    On or about December 6, 2007, SKUHROVEC submitted his application for the position of appraiser at the Sheriff's Office.

199.    On or about February 19, 2008, SKUHROVEC and DIMORA discussed a fundraiser for PO11 at Delsangro's Restaurant.  DIMORA advised SKUHROVEC that SKUHROVEC needed to find "new people that are not maxed out" and further instructed SKUHROVEC to find "new prospects, they gotta be new givers."  DIMORA advised SKUHROVEC that Russo could help SKUHROVEC compare SKUHROVEC's invitation list with a list of people who previously donated to PO11's campaign.  At the end of the call, DIMORA advised SKUHROVEC to "double check with Frank [Russo] on who you should invite," so that SKUHROVEC would "get givers" and not waste his time by "hav[ing] a fundraiser to have it."

200.    On or about February 29, 2008, BE10 told DIMORA that SKUHROVEC "is chasing me down for donations for [PO11]."  BE10 also complained about SKUHROVEC wanting BE10 to ask other people for donations.  BE10 indicated he was not going to ask other people but he was going to make a donation to PO11.  DIMORA agreed BE10 should not ask others and stated, "JERRY [SKUHROVEC] is just trying to feather his nest with [PO12].  Frank [Russo] tortured him and said he [SKUHROVEC] wasn't getting the job with [PO12] if he didn't, uh, if he didn't get the money for [PO11]."

201.    On or about March 3, 2008 at approximately 4:49 p.m., Russo told DIMORA he [Russo] was "so beat up over this.  You know, JERRY . . . PE24 was tap dancing."  Russo told DIMORA that Russo had told PE24 that was why they waited two months until after the election. Russo said that PE24 was "a little sneaky" and was reluctant to hire SKUHROVEC because he

59

presently worked for the Auditor's Office. Russo told PE24 that SKUHROVEC only works ten hours per week [at the Auditor's Office] in order to obtain benefits.

202.    On or about March 3, 2008 at approximately 4:57 p.m., Russo told DIMORA that SKUHROVEC raised $8,200 at the fundraiser for PO11.

203.    On or about March 17, 2008, DIMORA called SKUHROVEC and said he did not know the others were not going to pay for lunch. DIMORA assured SKUHROVEC that he did not call him to come to the restaurant to pay. DIMORA said he figured "one of those c–ks would throw it on their business account." SKUHROVEC said that he did not mind paying. DIMORA said, "I'm just kinda surprised these guys didn't put it on their business account. A couple hundred dollars that's nothing for them."

204.    On or about March 18, 2008 at approximately 5:45 p.m., Russo and DIMORA discussed a job for SKUHROVEC with the Sheriff's Office. DIMORA said that PO12 had asked DIMORA to hire his (PO12's) grandson, but now he (DIMORA) would not do it. DIMORA and Russo agreed that they needed to have lunch with PO12.

205.    On or about March 18, 2008 at approximately 9:31 p.m., DIMORA called PE18 and asked her to schedule a lunch meeting with PO12, Russo, and DIMORA.

206.    On or about March 19, 2008 at approximately 12:42 p.m., DIMORA told Russo, "PE24's trying to set that up with PO12 for Tuesday the 25th, lunch." Russo complained that he never received anything from PO12, although his (PO12's) relatives worked for him (Russo). Russo stated, "They didn't hire anybody for me. . . . I've never even asked him." DIMORA told Russo that PO12 wanted to wait until after the primary but wondered why he remained hesitant,

now that the primary was over. DIMORA and Russo discussed how Russo paid SKUHROVEC just enough in salary to pay for his health benefits.

207.    On or about March 25, 2008 at approximately 1:04 p.m., DIMORA asked PE11 to connect him to PE24 because DIMORA was with PO12 and was trying to "wrap this JERRY SKUHROVEC thing today so we can all be on the same page."

208.    On or about March 25, 2008 at approximately 1:05 p.m., SKUHROVEC asked DIMORA if he met him (PO12) already. DIMORA replied, "We're sitting here now." DIMORA asked SKUHROVEC what they (Sheriff's Office) told him (SKUHROVEC) "to get with regard to this appraisal position." SKUHROVEC explained that he obtained a license from the State of Ohio and sent the information to PE24 about two months prior. SKUHROVEC told DIMORA that he needed hours in the field in order to be a certified appraiser. DIMORA told SKUHROVEC that they (DIMORA and Russo) were discussing that with PO12 now.

209.    On or about March 25, 2008 at approximately 1:48 p.m., PE11 connected DIMORA to PE24. DIMORA informed PE24 that he just finished a meeting with PO12, and "we came to a decision here with regard to the confusion on this JERRY SKUHROVEC issue." DIMORA explained that they would obtain a prosecutor's legal opinion with regard to SKUHROVEC working eight hours at the Auditor's Office in addition to working for the Sheriff's Office.

210.    On or about March 25, 2008 at approximately 2:13 p.m., SKUHROVEC thanked DIMORA for talking with PO12. DIMORA stated, "But listen, I think we got it resolved. He's gonna have to f---in' do it ya know, he's looking for his grandson to get a f---in' job. We're

gonna put his grandson on. I didn't put him on deliberately until you got on, 'cause if he don't put you on, f--k his grandson. I ain't putting him on. I got it in limbo. I got it held up. He knows that, too, I'm sure. I'm sure he checked with PO10 'cause he [PO12] let it slip that PO10 told him, 'Oh yeah, we're gonna take care of your grandson.'"

211.    On or about March 25, 2008 at approximately 4:08 p.m., Russo left the following voice mail message for SKUHROVEC: "Hey JER, this is Frank. It's four o'clock, I just left JIMMY we talked to . . . Ten minutes ago we talked to [the Prosecutor's Office]. He thinks everything is okay. He's going to research it tomorrow, and then give us a legal opinion, a couple of sentences. He doesn't think there's a problem. I know there isn't. Unless he finds something in the law that I'm unaware of. So, I think that it's pretty clear sailing. We just need the letter. We'll give it to PE24. She'll give ya a starting date. But all day long it's all nonsense with him. It was nonsense. Okay buddy, bye."

212.    On or about March 25, 2008, PO12, DIMORA and Russo met at Delsangro's restaurant. During the meeting, DIMORA told PO12 that he wanted the job for SKUHROVEC to be "PERS".

213.    On or about March 26, 2008 at approximately 11:17 a.m., SKUHROVEC thanked DIMORA for his efforts the previous day. DIMORA said that he had just spoken to PO12 again. They discussed issues surrounding PO12 hiring SKUHROVEC.

214.    On or about March 26, 2008 at approximately 11:50 a.m., SKUHROVEC told Russo, "I just want to thank you for yesterday again." Russo replied, "Oh, no problem," and explained to SKUHROVEC that he believed it would be legal for SKUHROVEC to be employed

by both Russo and the Sheriff's Office. Russo told SKUHROVEC that he might have to pay his own hospitalization for awhile, but he (PO12) said SKUHROVEC would be able to make a minimum of $50,000. Russo stated, "He's [PO12] definitely going to give it to you, JER. It's just a matter of what we gotta do with your benefits. But I think you're going to be okay." Russo told SKUHROVEC that as soon as PO12 received something in writing from the Prosecutor's Office, SKUHROVEC would be able to start work in the Sheriff's Office.

215.    On or about March 31, 2008, Russo informed SKUHROVEC, "I called [PE24], she wasn't in, so I got her on her cell. She didn't get the letter yet, so I faxed it over to PO12's secretary." Russo said that he told PE24 that the letter was exactly what PO12 wanted and then told SKUHROVEC to expect a call from her within the next couple of days. SKUHROVEC told Russo he (SKUHROVEC) would contact Russo if he did not hear from the Sheriff's Office by Wednesday.

216.    On or about April 1, 2008 at approximately 12:07 p.m., Russo and DIMORA discussed issues related to SKUHROVEC obtaining employment with the Sheriff's Office.

217.    On or about April 2, 2008 at approximately 1:11 p.m., SKUHROVEC told DIMORA, "Thank you. PO12 called this morning and next Wednesday is my first day." DIMORA replied, "Listen, I heard about it all this morning, about how he's doing it all for me. I said, 'I know, thank you [PO12], thank you.' He called me this morning, making me crazy. . . he's looking for the grandson. I know the whole story with him." Later in the conversation, DIMORA stated, "Now that you got a fifty thousand f---in' stipend for a part-time job, your luck is running your way, you ought to keep it on a roll." SKUHROVEC replied, "It may be fifty

thousand, you don't know, it's just on these foreclosures." DIMORA replied, "Well, every time, you know, [others] are going out, they better be calling you." SKUHROVEC replied, "Oh yeah, no, no, you go out every week, every single week . . . either Tuesday or Wednesday. No I know, I'm going to have to bring food all summer." DIMORA replied, "More than food JER, but I'll explain that to you when we're not on the phone." SKUHROVEC laughed.

218.     On or about April 21, 2008 at approximately 1:59 p.m., Russo asked SKUHROVEC about his new job with PO12. SKUHROVEC clarified that he was only working for PO12 one day per week.

219.     On or about May 13, 2008 at approximately 2:24 p.m., SKUHROVEC told Dimora that he had a three-gallon bucket of ice cream for DIMORA. DIMORA said he would put it in his freezer with the other "donations."

220.     On or about  July 16, 2008 at approximately 12:17 p.m., SKUHROVEC told Russo that he just appraised a property and asked if BE13 planned to move closer to Russo. SKUHROVEC said that he had appraised a property on Chagrin River Road with 2.5 acres of land. SKUHROVEC said a family lived in the house but that it may sell for $180,000 to $190,000, which Russo called a "steal, my God that's a f---ing steal." Russo said he would call BE13 "right now."

221.     On or about July 16, 2008 at approximately, 12:22 p.m., Russo called BE13 and relayed the conversation with SKUHROVEC. Russo said the property contained two homes on one parcel. BE13 said the price was cheap for Gates Mills and indicated that they had to jump on it.

222.    On or about July 18, 2008 at approximately 11:13 a.m., Russo told SKUHROVEC that BE13 and Russo had driven by the Gates Mills house (on Chagrin River Road) and thought it had potential after some renovation. Russo decided to wait for the Sheriff's sale on it. Russo confirmed the property held two buildings. Russo lamented that BE13 and he could not walk the property because someone lived there. SKUHROVEC said that he could tell the owners that he worked for the Sheriff's Office and that he needed to do another appraisal. SKUHROVEC then suggested Russo could go there and say that as the County Auditor, he needed to look at it.

223.    On or about July 18, 2008, SKUHROVEC paid approximately $125 to entertain DIMORA and others in DIMORA's party.

## EXECUTION OF THE SCHEME

224.    On or about the dates listed below, in the Northern District of Ohio and elsewhere, DIMORA, Russo, SKUHROVEC and others, for the purpose of executing the above-described scheme and artifice, caused the following documents to be delivered and sent through the United States mails:

| Date | Description |
| --- | --- |
| December 20, 2007 | SKUHROVEC's appraisal license sent from Columbus, Ohio to SKUHROVEC's residence in Independence, Ohio. |
| January 3, 2008 | Letter from SKUHROVEC to PE24's office in Cleveland, Ohio, enclosing documents from the State of Ohio concerning his appraisal license. |
| March 10, 2008 | Contribution to PO11's campaign sent from Bedford Heights, Ohio to Bat-A-Rama, in Maple Heights, Ohio. |

All in violation of Title 18, United States Code, Section 1349.

The Grand Jury further charges:

## COUNT 10
(Hobbs Act, 18 U.S.C. § 1951)

225.    Paragraphs 1-3, 5-6, 9, 28 and 32-33 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

226.    Beginning in or about 2006 and continuing until on or about July 18, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA did knowingly obstruct, delay and affect and attempt to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained and attempted to obtain property not due to him or his office, including food, and entertainment, from Jerry Skuhrovec, with his consent, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

## COUNT 11
(False Statements to Law Enforcement, 18 U.S.C. § 1001)

227.    Paragraphs 28-29, 32 and 42 of this Indictment are re-alleged and  incorporated by reference as if fully set forth herein.

228.    Beginning in or around February 2008, the FBI, part of the executive branch of the Government of the United States, and acting in a matter within its jurisdiction, was investigating JERRY SKUHROVEC for providing things of value to Frank P. Russo and James

C. Dimora, in return for Russo and Dimora using their county positions to benefit SKUHROVEC, in violation of federal law.

229. On or about July 28, 2008, Special Agents of the FBI interviewed SKUHROVEC in connection with the investigation.

The Offense

230. On or about July 28, 2008, in the Northern District of Ohio, Eastern Division, Defendant JERRY SKUHROVEC knowingly and willfully made the following material false statements in a matter within the jurisdiction of the executive branch of the Government of the United States: (1) SKUHROVEC told the FBI Agents that he never told anyone about properties that he appraised that were going into foreclosure; (2) SKUHROVEC told the FBI Agents that he never provided any information about an appraisal to anyone; (3) SKUHROVEC told the FBI Agents that he never discussed his appraisals with James C. Dimora, Frank P. Russo or any other public official; and (4) SKUHROVEC told the FBI Agents that he did not host a fund raiser for PO11, well knowing at the time he made the statements to Special Agents of the FBI that such statements were false.

All in violation of Title 18, United States Code, Section 1001.

The Grand Jury further charges:

COUNT 12<br>(Conspiracy to Commit Mail Fraud and Honest Services Mail Fraud, 18 U.S.C. §§ 1341 and 1346, in violation of 18 U.S.C. § 1349 )

231. Paragraphs 1-3, 10, 28, 30, 44, 55, 61 and 64-65 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

## THE CONSPIRACY

232. From on or about March 14, 2008, and continuing through on or about July 24, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division, Defendant JAMES C. DIMORA, PE39 (not charged herein) and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to commit an offense against the United States, namely, to devise and intend to devise a scheme and artifice:

(1) to defraud and deprive Cuyahoga County and its citizens of their right to the honest and faithful services of DIMORA, through bribery and the concealment of material information related thereto, and

(2) to defraud Cuyahoga County, the City of Bedford, Ohio and the City of Solon, Ohio and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises,

and for the purpose of executing such scheme and artifice, to cause matters to be placed in any post office and authorized depository for mail matter to be sent and delivered by the United States Postal Service and private and commercial interstate carrier, in violation of Title 18, United States Code, Sections 1341 and 1346.

## OBJECT OF THE CONSPIRACY

233. It was the object of the conspiracy that DIMORA secretly used his official position to benefit himself, by soliciting and accepting sexual favors and other things of value from PE39, in exchange for favorable official action, and that PE39 enriched herself by secretly

obtaining favorable official action for herself through corrupt means.

## MANNER AND MEANS

It was part of the conspiracy that:

234.    DIMORA solicited and accepted sexual favors and other things of value from PE39.

235.    DIMORA provided favorable official action for the benefit of PE39 as requested and as opportunities arose, to include taking favorable personnel actions to benefit PE39, including, to help obtain public employment for PE39, on terms agreeable to PE39, and which included PE39 obtaining OPERS benefits and a salary PE39 desired.

236.    The conspirators took steps to hide, conceal, and cover up their activity and the nature and scope of PE39's dealings with DIMORA.

Acts in furtherance of the conspiracy

237.    On or about March 14, 2008, DIMORA and PE39 agreed to meet at the Doubletree Hotel in Independence, Ohio the following day for the purpose of having sex with one another. DIMORA told PE39 that it was discreet there. PE39 commented, "F---in' you is a wonderful thing." Later in the conversation, DIMORA told PE39 that he looked forward to tomorrow, stating, "What an unexpected pleasure." PE39 responded, "Good things come to those who wait."

238.    On or about March 15, 2008 at approximately 11:26 a.m., DIMORA asked Gabor if it was necessary to provide a name when checking into a hotel if paying in cash. Gabor told DIMORA that the hotel would ask for your driver's license. DIMORA asked if Gabor would

69

reserve a room for DIMORA at the Doubletree Hotel that day. DIMORA told Gabor he wanted

to go to a hotel that did not have a lot of "activity" and where DIMORA could "hide." Gabor

agreed to rent the room for DIMORA, but indicated that he was not available until later in the

day, due to plumbing repairs at his house.

239.    On or about March 15, 2008 at approximately 12:25 p.m., Gabor told DIMORA

he was still occupied with the plumbing repairs at his house.

240.    On or about March 15, 2008 at approximately 2:50 p.m., PE39 rented a hotel

room at the Holiday Inn in Independence, Ohio, paying in cash.

241.    On or about March 17, 2008, DIMORA asked PE39 if she had a resume and told

PE39 that he needed to get "something in their hands." DIMORA said he had spoken with

PO13, and PO13 could find PE39 a job at the City of Bedford Municipal Court in a few months

but they had something for PE39 now in Solon for a few days per week. DIMORA told PE39

she could make more money working three or four days a week in Solon than she did presently

working full-time. DIMORA instructed PE39 to send her resume to DIMORA's County office.

242.    On or about March 19, 2008, DIMORA asked PE18 if she received a resume from

PE39. PE18 told DIMORA that the resume was there. DIMORA replied that it was not for a

County job and that he had to give the resume to someone. DIMORA instructed PE18 to put the

resume in DIMORA's folder, which was to be delivered by a County employee to DIMORA's

residence.

243.    On or about March 21, 2008, PE39 told DIMORA that PO13 had left PE39 a

message "saying that he [PO13] didn't have anything available" and that PO13 would probably

70

talk to PE39 on Tuesday. DIMORA told PE39, "But what they're gonna to do is they're gonna put you in Solon I think. . . . I just told him [PO13], 'Let, let's get her into, back into PERS, even if it's part-time to start out with . . . and then we'll either move it to full time over at Solon or we'll try to put you at the court.'" PE39 replied, "Okay . . . that's good." DIMORA also told PE39, "So, I would imagine, you know I'll just stay on top of him and hound him, so I'm hoping you know three to four months, we'll be able to get you over there." At the end of the conversation, PE39 said to DIMORA, "We'll have to get together soon." DIMORA responded, "Okay, I look forward to it."

244.    On or about March 24, 2008, DIMORA and PO13 discussed PE39 obtaining public employment. DIMORA told PO13 that PE39 said, "She'd like to be somewhere around 40 [$40,000 per year]." PO13 told DIMORA, "At least if we get her even part-time, at least this way the clock's ticking." DIMORA replied, "At least then I got a lay over like I did with uh, uh, PE38, yeah and then I, see I got her in the full-time now with the State, so she's happy and I don't even hear from her." DIMORA said, "So I wanna do the same thing with her [PE39] and then I'm done."

245.    From on or about March 17, 2008 through on or about July 17, 2008, PO13 had approximately 31 conversations with DIMORA and others about PE39 obtaining public employment.

246.    On or about March 25, 2008, DIMORA and PE39 discussed PO13 leaving PE39 a message about a part-time job with the City of Solon. DIMORA told PE39, "What I wanna try to do is, you know, if I can get your foot in the door like we did with [PE38]. Then I can, you

71

know, press 'em a little harder then to make it full time." PE39 responded, "Right, right."

247.    On or about April 2, 2008, PE39 said, "You need to look in your schedule and see when you're available." DIMORA replied, "Everything going okay?" PE39 responded, "Yeah everything's fine. I just am uh rarin' to go." DIMORA said, "Alright." PE39 and DIMORA then spoke about a job opportunity for PE39. PE39 informed DIMORA that she makes two thousand per month and would need to make at least that much. PE39 mentioned that she never went to see PO13 but spoke with him on the phone. DIMORA told PE39 he would make a call and informed her that they were "three quarters of the way there so I'm gonna make sure we get it." DIMORA said he would "work" on PO13 and try to obtain 85% to 90% of her current salary and OPERS benefits. PE39 stated, "Let me know when you're available. We'll go have drinks . . . or something (laughs)." DIMORA said, "That's a deal, deal, deal."

248.    On or about April 3, 2008 at approximately 2:53 p.m., DIMORA left a message for PE39 that he had spoken with PO13, and PO13 would call PE26 about getting her more money.

249.    On or about April 3, 2008 at approximately 8:27 p.m., DIMORA told PE39 that he had spoken with PO13, who had spoken with PE26. DIMORA wanted to know if PE39 would meet him on Saturday afternoon for a "drink or something."

250.    On or about April 22, 2008 at approximately 7:36 p.m., PE39 asked DIMORA if he received her text message the previous day. DIMORA said he received the message and had spoken to PO13 about the finance position. DIMORA explained that PO13 had indicated to DIMORA that the finance position would not work out, but PO13 could put PE39 at the court for

72

the Summer and then they would move her to Solon City Hall. PE39 said she had received a

message from PE26 informing her they had someone else in mind for the finance job, but then

received a message from the finance department for an interview. PE39 said she was unsure if it

was just a courtesy interview and talked with DIMORA about whether she should attend.

DIMORA told PE39 he would contact PO13 to "see what's going on with that."

251. On or about April 22, 2008 at approximately 9:31 p.m., DIMORA explained to

PE39 the circumstances surrounding the finance position and encouraged her to interview.

DIMORA provided PE39 with PO13's telephone number and told her to call him (PO13) the

following day.

252. On or about April 25, 2008, DIMORA and PE39 discussed her job interview.

PE39 said that she could not judge the interview either way and that she was told they would call

her the following week about a second interview. PE39 said, "F–k this," explaining that she had

already met with PE26. The female interviewer questioned PE39's lack of finance experience.

DIMORA assured PE39 he would stay on top of PO13 to make the other thing happen. PE39

said that a part-time position would be fine, but she needed to make at least $2,000 per month.

PE39 said she would call DIMORA. DIMORA said that his wife would be gone the following

day.

253. On or about April 30, 2008, DIMORA told PE39 that he had spoken with PO13

and PO13 was coordinating the Summer situation and would work with PE26 to arrange

something for the Fall. DIMORA stated, "I just wanna get you going, you know, get the foot in

the door." PE39 wanted to know when she would be able to start. DIMORA thought she would

start at the end of May or the first part of June. DIMORA told PE39 that his wife would be out

of town for the weekend and stated, "If you get free on the weekend, let me know. . . I'll stay on

top of these guys."

254.    On or about May 13, 2008, DIMORA told PE39 she would start with the court in

the middle of June, where she would work until they created another job.

255.    On or about May 15, 2008, DIMORA told PE39 that PO13 mentioned having

PE39 start in the middle of June, and work in the court for the Summer. PO13 would talk to

PE26 that evening about hiring PE39 full time. DIMORA told PE39, "I just wanna get you in

um . . . PERS, 'cause I know once you're in it, they're not gonna let you out." PE39 replied,

"Right, exactly." DIMORA stated, "I guess what I would do if I were you maybe next week just

call PO13 and just talk to him about uh, you know, what I just told you, and try to get a, uh, you

know, like approximate start date." DIMORA then said, "They'll pay you at least what you were

making a week there for the time being, maybe he can throw you a little more. That's what he

was working on." PE39 said one of these days she was going to "get together" with DIMORA.

256.    On or about June 2, 2008 at approximately 5:19 p.m., PE39 informed DIMORA

that she had just met with PO13 and the earliest she could start would be July 14th. PE39 said

that PO13 told her that they had some archiving and shredding that needed to be done. PE39

indicated she was told that there were no immediate openings, and the only way she could work

would be if a project was created. PE39 expressed her concern to DIMORA that once the project

was over she would be out of a job if Solon could not provide a job. DIMORA replied, "No, we,

74

no, that's nuts. That's no good, that ain't what they told me anyways." PE39 and DIMORA

agreed to meet 15 to 20 minutes later for a drink at Shula's restaurant.

257.    On or about June 2, 2008 at approximately 6:01 p.m., DIMORA asked PE39,

"Nobody in there that you recognize is there?" PE39 replied, "Nope, it's pretty slow."

DIMORA replied, "That's what I wanted to hear. . . . Two minutes I'll be there. You're in the

restaurant all the way to the back?" PE39 replied, "Yep."

258.    On or about June 2, 2008 at approximately 8:34 p.m., DIMORA asked Gabor to

meet him "over there" and to call him when he (Gabor) arrived "there." DIMORA stated, "Call

me when you're there in the lot." Gabor asked, "Okay, after I do it?" DIMORA replied, "No,

before." Gabor replied, "Okay, you got it. I'll call you in . . . fifteen minutes."

259.    On or about June 2, 2008 at approximately 8:42 p.m., PO13 told DIMORA that

the "game plan" was to bring PE39 on board with the court because PO13 had a record retention

project, and thereafter, they would work toward the Solon deal. DIMORA informed PO13 that

he believed PE39 was nervous about not having a job. PO13 stated, "I'm gonna have her, uh,

she's gonna work like three and half days a week. . . . So I'm gonna pay her so that it works out

so she's making what she needs to make." DIMORA asked again, "Okay, that'll be good, but

you think you guys will be able to carry her until the Solon deal comes through?" PO13 replied,

"Yeah, I'm not gonna, I'm not gonna stiff her." DIMORA told PO13 that PE39 wanted to be

back into the OPERS system and asked, "You're pretty sure, though, PE26, uh, can deliver?"

PO13 replied, "I talked to PE26 today, again, and you know we're gonna make it work one way

or the other." PO13 stated, "We're doing okay in (UI). I know she, she's looking to you and you

know uh, I want to, get I want to do this for you and you know for her, and you know the judge does, too and I mean we'll get it done." PO13 confirmed with DIMORA that PE39 wanted to make $2,000 per month.

260.    On or about June 2, 2008 at approximately 9:01 p.m., DIMORA told Gabor, "Be there in two minutes." Gabor replied, "Where, where we said, right?" DIMORA replied, "Yeah, I'm gonna meet you right in the parking lot there." DIMORA later stated, "I don't know the people here. I don't want to know them."

261.    On or about June 2, 2008 at approximately 9:11 p.m., Gabor rented a hotel room at the Holiday Inn in Independence, Ohio, paying in cash.

262.    On or about June 2, 2008 at approximately 9:19 p.m., DIMORA stated, "Hey, I'm coming down." PE39 asked, "Hey, did Michael already get the room?" DIMORA replied, "Yeah, we're all set." PE39 replied, "I was gonna tell you there's nobody at my house for the entire night." DIMORA replied, "We're all set. I'm on my way, coming back already." PE39 replied, "Alright. Well, let me know when you get there and what room and all that good stuff." DIMORA told PE39 that he wanted to make sure Gabor had left and then would bring her a key to the room. PE39 asked, "You don't trust him, huh?" DIMORA replied, "Yeah, I trust him. I just don't want to have him. . . ." PE39 finished DIMORA's sentence, "You just don't want him to know who it is." PE39 told DIMORA that she trusted Gabor and did not care if he knew about them.

263.    On or about June 2, 2008 at approximately 10:29 p.m., DIMORA asked PE39, "You're already in your car?" PE39 replied, "No, I'm just walking out of the building."

76

DIMORA stated, "Oh, I'll talk to you 'til you get in your car then," and then asked, "You got dressed that fast?" PE39 replied, "I'm pretty quick . . . doesn't take much to get dressed." DIMORA stated, "Guess not." PE39 stated, "Underwear, bra, pants, shirt." DIMORA and PE39 discussed a couple of "seedy looking guys" DIMORA saw in the parking lot, which caused him to check on her. DIMORA stated, "I'll stay in touch with uh, with ya, after I see what's going on with PO13. Did he, how did you guys leave it? Are you supposed to call him at the end of June?" PE39 replied, "He made it sound like I need to show up on July 15th, so that's what I'm doing." DIMORA stated, "I'll call him [PO13]. You know, I'll wait a day or two and I'll say you called me . . . PO13 will follow through with it."

264.    On or about June 5, 2008, DIMORA told PE39, "And, um, um, I'll be you know talkin' to ya. I talked uh, to [PO13]. Everything's good there, and um, you know. We may end up, we'll see how things work out. You may end up, he was even sayin' he doesn't know what's gonna happen by the end of the year with some of the people there you know so. . . ." PE39 replied, "Whatever, you know me."

265.    On or about June 19, 2008, PE39 asked DIMORA if he had spoken with PO13 or PE26 because she wanted to make sure everything was in line for her employment. DIMORA told PE39 to call PO13 and say, "JIMMY said I should call you." PE39 said that she was submitting her two week notice the following Monday. PE39 suggested DIMORA call her and stated, "If we don't get together this weekend, maybe one day next week or whatever." DIMORA replied, "Okay honey, I always like your company." PE39 replied, "I like yours, too."

266. On or about June 20, 2008, DIMORA left a voice mail message for PE39. DIMORA informed PE39 that he had spoken with PO13, who told DIMORA to tell PE39 that everything was "fine" and "set" for PE39 to start working for the court.

267. On or about July 11, 2008, PE39 and DIMORA discussed PE39 starting a new job at the Bedford Court and also discussed meeting that evening because PE39's husband took her children to the water park.

### EXECUTION OF THE SCHEME

268. On or about July 22, 2008, DIMORA and PE39, for the purpose of executing the above-described scheme and artifice, caused documents related to PE39's enrollment in OPERS to be sent through the United States mails from Bedford, Ohio, in the Northern District of Ohio, to OPERS in Columbus, Ohio.

All in violation of Title 18, United States Code, Section 1349.

The Grand Jury further charges:

### COUNT 13
(Hobbs Act Conspiracy, 18 U.S.C. § 1951)

269. Paragraphs 1-3, 5-6, 23, 28, 74 and 77 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

270. Beginning in or around 2007 and continuing until on or about June 6, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA, and John Valentin (not charged herein) and others known and unknown to the Grand Jury, did knowingly and intentionally combine,

78

conspire, confederate and agree with each other to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, from Salva Stone and John Valentin, with their consent, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

## OBJECTS OF THE CONSPIRACY

271.    It was an object of the conspiracy that DIMORA solicited and accepted from Salva Stone and Valentin things of value, to include free and discounted home improvements and materials, in return for DIMORA using his County position to benefit Valentin's friend with an immigration issue.

272.    It was a further object of the conspiracy that DIMORA concealed and attempted to conceal the bribes described in this Count of the Indictment from law enforcement and the public.

## MANNER AND MEANS

It was part of the conspiracy that:

273.    In or around 2007, DIMORA visited Salva Stone and selected granite for his residence. There was no discussion about price or payment.

274.    In or around 2007, Salva Stone installed granite in DIMORA's residence. Salva Stone did not bill DIMORA for the work and did not expect payment for the work.

275.    On or about May 3, 2007, DIMORA caused a federal official to correspond with the Embassy of the United States in Bucharest, Romania, related to a non-immigrant visa

79

application submitted by Valentin's friends.

276.    In or around Spring 2008, Salva Stone performed work at DIMORA's residence. Salva Stone did not bill DIMORA for the work and did not expect payment for the work.

277.    On or about May 23, 2008, after DIMORA learned the FBI was investigating Steven Pumper, DIMORA caused a personal check on his bank account to be written payable to Salva Stone in the amount of $250, which Valentin caused to be deposited on or about June 6, 2008. The amount of the check did not cover the total value of the work performed at the DIMORA residence.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

COUNT 14
(Hobbs Act, 18 U.S.C. § 1951)

278.    Paragraphs 1-3, 5-6, 23, 28 and 77 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

279.    Beginning in or around 2007 and continuing until on or about June 6, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES DIMORA did knowingly obstruct, delay and affect and attempt to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, namely, free and discounted home improvements and materials, from Salva Stone and John Valentin, with their consent, under color of official right.

80

All in violation of Title18 United States Code, Section 1951.

The Grand Jury further charges:

### COUNT 15
(Hobbs Act Conspiracy, 18 U.S.C. § 1951)

280.    Paragraphs 1-3, 5-6, 11, 24, 28, 52 and 78 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

281.    Beginning in or around 2001 and continuing until on or about May 30, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES DIMORA, and Nicholas Zavarella (not charged herein), and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, from ZBC and Zavarella, with their consent, under color of official right.

### OBJECTS OF THE CONSPIRACY

282.    It was an object of the conspiracy that DIMORA solicited and accepted from Zavarella and ZBC things of value, to include free and discounted home improvements, in return for DIMORA using his County position to benefit Zavarella, Zavarella's relative, and others, both as requested and as future opportunities arose.

283.    It was a further object of the conspiracy that DIMORA concealed and attempted to conceal the bribe from ZBC and Zavarella from law enforcement and the public.

81

## MANNER AND MEANS

It was part of the conspiracy that:

284.    In or around 2001, DIMORA assisted a relative of Zavarella in obtaining a job with the County.

285.    In or around 2002, DIMORA asked Zavarella to have ZBC perform work at DIMORA's residence.  DIMORA did not ask for a quote and did not offer to pay for the work. ZBC performed the work, but neither ZBC nor Zavarella billed DIMORA for the work.

286.    In or around 2004, DIMORA asked Zavarella to have ZBC perform work at DIMORA's residence.  Zavarella and DIMORA did not discuss payment.  ZBC performed the work, but neither ZBC nor Zavarella billed DIMORA for the work.

287.    In or around late 2005 or early 2006, DIMORA agreed to help Zavarella's relative obtain a teaching job in School District 1.  Zavarella's relative began teaching in School District 1 in early 2006 as a substitute.

288.    On or about April 26, 2007, DIMORA caused a reference letter for Zavarella's relative, bearing his signature on County Commissioners' letterhead to be sent to School District 2. Zavarella's relative began teaching in School District 2 in the Fall of 2007.

289.    In or around 2007, DIMORA asked Zavarella to have ZBC perform work at DIMORA's residence.  Zavarella and DIMORA did not discuss payment.  ZBC performed the work, but neither ZBC nor Zavarella billed DIMORA for the work.

290.    On or about March 24, 2008, Zavarella called DIMORA to express his concern about the possibility that a proposed County construction project was being undermined.

82

Zavarella explained that ZBC would be obtaining subcontract work on the project and that Zavarella was working with a contractor on budget numbers. DIMORA said he would have his assistant "snoop around."

291.    On or about March 24, 2008, DIMORA called PE11 and asked that PE11 investigate the matter about which Zavarella had inquired.

292.    Beginning on or about May 23, 2008, DIMORA attempted to conceal from law enforcement and the public the fact that DIMORA had not paid for the work performed by ZBC.

293.    On or about May 23, 2008, DIMORA caused a personal check on Lori and JAMES DIMORA's personal checking account to be written payable to ZBC in the amount of $500.

294.    On or about May 28, 2008, DIMORA asked Zavarella to send DIMORA a bill for the work ZBC had performed at DIMORA's residence. DIMORA told Zavarella that something was happening and DIMORA did not want Zavarella to get involved because Zavarella did not do County work.

295.    On or about May 30, 2008, Zavarella caused to be sent an invoice to DIMORA falsely stating that $6,687 worth of work had been completed "as of 3/31/08."

All in violation of Title 18, United States Code, Section 1951.

83

The Grand Jury further charges:

## COUNT 16
(Hobbs Act, 18 U.S.C. § 1951)

296. Paragraphs 1-3, 5-6, 24, 28 and 78 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

297. Beginning in or around 2001 and continuing until on or about May 30, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES DIMORA, did knowingly obstruct, delay and affect and attempt to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, namely, free and discounted home improvements and materials, from ZBC and Nicholas Zavarella, with their consent, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

## COUNT 17
(Hobbs Act Conspiracy, 18 U.S.C. § 1951)

298. Paragraphs 1-3, 17, 21, 26, 28-30, 34, 45, 55, 62, 68 and 80 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

## INTRODUCTION

299. In or around 2006, the County Commissioners approved construction of a new Juvenile Justice Center at East 93rd Street and Quincy Avenue in Cleveland, Ohio, at an estimated cost of approximately $160 million (hereinafter "JJC project").

300.     On or about December 13, 2007, the County Commissioners issued requests for proposals ("RFPs") for various portions of the JJC project.

301.     On or about February 22, 2008, Reliance Mechanical submitted bids in response to the County's RFP for the HVAC and plumbing portion of the JJC project.

302.     On or about March 20, 2008, the County Commissioners voted to reject all bids received for the plumbing portion (and other portions) of the JJC and ordered that the plumbing portion (and other portions) be rebid.

303.     On or about April 7, 2008, Reliance Mechanical submitted a second bid for the plumbing portions of the JJC project.

304.     In or around early 2008, NEIHEISER sought to obtain a lease for an ice skating rink between the City of Lakewood and Winterhurst.  On or about June 6, 2008, the City of Lakewood entered into the lease with Winterhurst.

### THE CONSPIRACY

305.     Beginning in or around Fall 2007 and continuing until on or around June 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants JAMES C. DIMORA and WILLIAM N. NEIHEISER, and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, from NEIHEISER and Reliance Mechanical, with their consent, under color of official right.

85

## OBJECT OF THE CONSPIRACY

306.     It was the object of the conspiracy that DIMORA solicited and accepted things of value, including free and discounted home improvements, materials and financial assistance, from NEIHEISER and Reliance Mechanical, in return for DIMORA using his County position to benefit NEIHEISER, Reliance Mechanical and Winterhurst, both as requested and as future opportunities arose.

## MANNER AND MEANS

It was part of the conspiracy that:

307.     In or around Fall 2007, NEIHEISER caused Reliance Mechanical to perform free and discounted home improvements at DIMORA's residence.

308.     On or about February 11, 2008, DIMORA and NEIHEISER spoke about the JJC project. NEIHEISER mentioned that the County Commissioners threw out the low bid for the structural steel portion of the JJC project based on technicalities. NEIHEISER told DIMORA that when Reliance Mechanical has the low bid, "Don't f—k it up," because when Reliance Mechanical wins the bid they (DIMORA and NEIHEISER) could "have fun for two years." DIMORA replied, "Good," and that he hoped Reliance Mechanical was the low bid.

309.     On or about February 16, 2008, DIMORA purchased a Chris "Beanie" Wells football jersey at the Cornerstone of Hope charity auction for approximately $3,600.

310.     On or about February 22, 2008, BE10 and DIMORA discussed the JJC bids, including Reliance Mechanical not being the low bidder by "a couple million dollars." DIMORA said, "There's no way we could do him if he's that far off." BE10 stated that he was

going to call NEIHEISER. DIMORA told BE10, "Just make sure he [NEIHEISER] remembers about my 3,600." BE10 responded, "That we'll take care of. May, maybe he threw it in the bid." They both laughed.

311.    On or about March 6, 2008 at approximately 5:08 p.m., DIMORA told PE18 to get NEIHEISER on the phone or leave NEIHEISER a message to call DIMORA.

312.    On or about March 6, 2008 at approximately 5:10 p.m., DIMORA told PE27 to retrieve documents related to the JJC from DIMORA's desk and bring them to DIMORA, who was by Frank Russo's office.

313.    On or about March 6, 2008 at approximately 5:11 p.m, DIMORA told NEIHEISER he would be at Delmonico's restaurant from 6:00 p.m. to 9:00 p.m. NEIHEISER said he would stop by and have a drink. NEIHEISER said that he would pay for the Wells jersey if DIMORA bought the drink. DIMORA replied, "Deal." They both laughed.

314.    On or about March 6, 2008 at approximately 8:15 p.m., DIMORA spoke to PO14, who said, "I heard you were lookin' for me." DIMORA replied, "Yeah. I was sittin' here with a friend of mine who's been tryin' to get ahold of you and talk to you about your ice rink. He wants to make a proposal to you uh that he thinks will be advantageous to the City and to you if uh you wanted to talk to him and I mean the guy's. . . . " PO14 asked if it was NEIHEISER. DIMORA confirmed it was. PO14 said that he has been unable to return NEIHEISER's call because PO14 had been in union negotiations. PO14 told DIMORA that PO14 would "be more than happy to talk to the guy." DIMORA said, "Okay. Uh, do you want me to tell . . . I'm sittin' next to him here but he can't hear me. Do you want me to tell him like you'll call him next week

87

or. . . ."  PO14 told DIMORA to have NEIHEISER call him at 9:30 the following morning and

PO14 will "make time . . . I'll make time . . . I'll make time to talk to him."  DIMORA told

PO14, "If there's anything we can do, uh, let us know, you know, uh, any help we can provide."

315.    On or about March 6, 2008 at approximately 9:06 p.m., DIMORA told BE10 that

Kelley, NEIHEISER, NEIHEISER's acquaintance and his acquaintance's daughter, Michael

Gabor and others were with DIMORA at Delmonico's restaurant.  DIMORA told BE10, "BILLY

[NEIHEISER] just left."  BE10 asked, "Hey, did my guy [NEIHEISER], when he stopped by

there, took care of business didn't he?"  DIMORA replied, "I just told you he took care of more

than me."  BE10 responded, "Beautiful."

316.    On or about March 11, 2008, DIMORA caused to be deposited into his joint

checking account, a check in the amount of $3,600 drawn on NEIHEISER's account and made

payable to Lori Dimora, who was DIMORA's wife.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

COUNT 18
(Hobbs Act, 18 U.S.C. § 1951)

317.    Paragraphs 1-3, 5-6, 21-22, 28 and 68-69 of this Indictment are re-alleged and

incorporated by reference as if fully set forth herein.

318.    Beginning in or around Fall 2007 and continuing until in or around June 2008, the

exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division

and elsewhere, Defendant JAMES DIMORA did knowingly obstruct, delay and affect and

attempt to obstruct, delay and affect commerce and the movement of articles and commodities in

88

commerce by extortion; that is, DIMORA obtained property not due to him or his office, namely, free and discounted home improvements, materials and financial assistance, from NEIHEISER and Reliance Mechanical, with their consent, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

## COUNT 19
(Conspiracy to Commit Wire Fraud and Honest Services Wire Fraud, 18 U.S.C. §§ 1343 and 1346, in violation of 18 U.S.C. § 1349 )

319.    Paragraphs 1-3, 17, 21, 28-30, 34, 45, 55, 62, 68 and 80 of this Indictment are re-alleged and  incorporated by reference as if fully set forth herein.

## INTRODUCTION

320.    In or around 2006, the County Commissioners approved construction of a new Juvenile Justice Center at East 93rd Street and Quincy Avenue in Cleveland, Ohio, at an estimated cost of approximately $160 million (hereinafter "JJC project").

321.    On or about December 13, 2007, the County Commissioners issued requests for proposals ("RFPs") for various portions of the JJC project.

322.    On or about February 22, 2008, Reliance Mechanical submitted bids in response to the County's RFP for the HVAC and plumbing portions of the JJC project.

323.    On or about March 20, 2008, the County Commissioners voted to reject all bids received for the plumbing portion (and other portions) of the JJC and ordered that the plumbing portion (and other portions) be rebid.

324. On or about April 7, 2008, Reliance Mechanical submitted a second bid for the plumbing portions of the JJC project.

325. In or around 2008, NEIHEISER sought to obtain a lease for an ice skating rink between the City of Lakewood and Winterhurst. On or about June 6, 2008, the City of Lakewood entered into the lease with Winterhurst.

THE CONSPIRACY

326. From in or around Fall 2007 through in or around May 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants JAMES C. DIMORA and WILLIAM NEIHEISER, and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to commit offenses against the United States; that is, to knowingly devise and intend to devise a scheme and artifice:

(1) to defraud and deprive Cuyahoga County and its citizens of their right to the honest and faithful services of DIMORA, through bribery and kickbacks and the concealment of material information related thereto, and

(2) to defraud Cuyahoga County and certain contractors and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises,

and for the purpose of executing such scheme and artifice, to cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Sections 1343 and 1346.

## OBJECT OF THE CONSPIRACY

327.    It was the object of the conspiracy that DIMORA, with BE10's assistance, secretly used his official position to enrich himself by soliciting and accepting gifts, payments, and other things of value from NEIHEISER and Reliance Mechanical, in exchange for favorable official action, and that NEIHEISER enriched himself, Reliance Mechanical and Winterhurst by secretly obtaining favorable official action for themselves through corrupt means.

## MANNER AND MEANS

It was part of the conspiracy that:

328.    NEIHEISER and Reliance Mechanical gave and offered to give DIMORA gifts, payments, and other things of value, and in exchange, DIMORA provided favorable official action for the benefit of NEIHEISER and Reliance Mechanical as requested and as opportunities arose.

329.    DIMORA attempted to deprive the County and certain contractors of money and property by taking official action in the award and administration of public business, to the financial benefit of NEIHEISER, Reliance Mechanical and Winterhurst and to the financial detriment of the County and certain contractors, based on NEIHEISER offering and giving things of value to DIMORA and not based on merit.

330.    The conspirators took steps to hide, conceal, and cover up their activity and the nature and scope of NEIHEISER's dealings with DIMORA.

331.    BE10, at times, served as an intermediary between DIMORA and NEIHEISER.

Acts in furtherance of the conspiracy

332.    In or around Fall 2007, NEIHEISER caused Reliance Mechanical to perform free and discounted home improvements at DIMORA's residence.

333.    On or about February 11, 2008, DIMORA and NEIHEISER spoke about the JJC project. NEIHEISER mentioned that the County Commissioners threw out the low bid for the structural steel portion of the JJC project based on technicalities. NEIHEISER told DIMORA that when Reliance Mechanical had the low bid, "Don't f—k it up," because when Reliance Mechanical wins the bid they (DIMORA and NEIHEISER) could "have fun for two years." DIMORA replied, "Good," and that he hoped Reliance Mechanical was the low bid.

334.    On or about February 16, 2008, DIMORA purchased a Chris "Beanie" Wells football jersey at the Cornerstone of Hope charity auction for approximately $3,600.

335.    On or about February 17, 2008, DIMORA spoke to BE10 about the Wells football jersey Dimora purchased the previous evening. DIMORA complained that NEIHEISER had convinced DIMORA to purchase the jersey. DIMORA also indicated that NEIHEISER agreed to pay for half the jersey. DIMORA, imitating NEIHEISER, said, "I [NEIHEISER] got your back, I'm, I'm in for half." DIMORA then questioned, "What are we [DIMORA and NEIHEISER] going to do, rotate it every week?" BE10 responded by telling DIMORA to sell the jersey to NEIHEISER.

336.    On or about February 22, 2008, BE10 and DIMORA discussed the JJC project, including Reliance Mechanical not being the low bidder by "a couple million dollars." DIMORA said, "There's no way we could do him if he's that far off." BE10 stated that he was

going to call NEIHEISER. DIMORA told BE10, "Just make sure he [NEIHEISER] remembers

about my 3,600." BE10 responded, "That we'll take care of. May, maybe he threw it in the bid."

They both laughed.

337.    On or about March 2, 2008, BE10 told DIMORA he recently exchanged calls with

NEIHEISER. BE10 then said, "Your buddy [NEIHEISER] is coming on an airplane tomorrow.

He's gonna call you and come see you." BE10 then clarified who he was referring to and stated,

"My friend in the mechanical business who erred in judgment and now wants to fix his error in

judgment." DIMORA asked how NEIHEISER was going to "fix it." BE10 replied, "He's gonna

fix it the only way he possibly can." DIMORA then asked if he was supposed to meet with

NEIHEISER. BE10 told DIMORA, "He'll come see you." DIMORA and BE10 then discussed

Reliance Mechanical's bid for work at the JJC. DIMORA informed BE10 that Reliance

Mechanical was $2 million higher than the low bidder and inquired, "How could you be two

million off?" BE10 agreed two million was a lot of money. BE10, who was in Florida at the

time of the telephone call, told DIMORA he was staying in Florida a couple of extra days.

DIMORA and BE10 then discussed throwing out all the bids for the JJC because the proposals

submitted for the general trades portion were all significantly over budget.

338.    On or about March 3, 2008, BE10, from Florida, called DIMORA in Ohio. After

initially discussing the weather in Florida, BE10 asked DIMORA, "Did that clown call you today

yet?" DIMORA verified that BE10 was referring to NEIHEISER and told BE10 he had spoken

with NEIHEISER and they (DIMORA and NEIHEISER) were going to "hook up" the following

day. BE10 then suggested that NEIHEISER was "feeling the pressure" because Reliance

Mechanical was not the low bidder on the JJC. DIMORA told BE10 that he had spoken to the Construction Manager and "put a bug in his ear and told him to take a look, uh, at all the packages and if there's enough of them ya know, I said to him, 'Shouldn't we just throw them out and keep going.'" BE10 agreed and later responded, "I wanna make sure NEIHEISER takes care of business. That's all I care about." DIMORA replied, "Tomorrow. Hopefully I'm gonna see him."

339.    On or about March 6, 2008 at approximately 5:08 p.m., DIMORA told PE18 to get NEIHEISER on the phone or leave NEIHEISER a message to call DIMORA.

340.    On or about March 6, 2008 at approximately 5:10 p.m., DIMORA told PE27 to retrieve documents related to the JJC from DIMORA's desk and bring them to DIMORA, who was by Frank Russo's office.

341.    On or about March 6, 2008 at approximately 5:11 p.m, DIMORA told NEIHEISER he would be at Delmonico's restaurant from 6:00 p.m. to 9:00 p.m. NEIHEISER said he would stop by and have a drink. NEIHEISER said that he would pay for the Wells jersey if DIMORA bought the drink. DIMORA replied, "Deal." They both laughed.

342.    On or about March 6, 2008 at approximately 8:15 p.m., DIMORA spoke to PO14, who said, "I heard you were lookin' for me." DIMORA replied, "Yeah. I was sittin' here with a friend of mine who's been tryin' to get ahold of you and talk to you about your ice rink. He wants to make a proposal to you uh that he thinks will be advantageous to the City and to you if uh you wanted to talk to him and I mean the guy's. . . . " PO14 asked if it was NEIHEISER. DIMORA confirmed it was. PO14 said that he has been unable to return NEIHEISER's call

94

because PO14 had been in union negotiations. PO14 told DIMORA that PO14 would "be more than happy to talk to the guy." DIMORA said, "Okay. Uh, do you want me to tell . . . I'm sittin' next to him here but he can't hear me. Do you want me to tell him like you'll call him next week or. . . ." PO14 told DIMORA to have NEIHEISER call him at 9:30 the following morning and PO14 will "make time . . . I'll make time . . . I'll make time to talk to him." DIMORA told PO14, "If there's anything we can do, uh, let us know, you know, uh, any help we can provide."

343.    On or about March 6, 2008 at approximately 9:06 p.m., DIMORA told BE10 that Kelley, NEIHEISER, NEIHEISER's acquaintance and his acquaintance's daughter, Michael Gabor and others were with DIMORA at Delmonico's restaurant. DIMORA told BE10, "BILLY [NEIHEISER] just left." BE10 asked, "Hey, did my guy [NEIHEISER], when he stopped by there, took care of business didn't he?" DIMORA replied, "I just told you he took care of more than me." BE10 responded, "Beautiful."

344.    On or about March 7, 2008, DIMORA told BE10 that NEIHEISER wanted to take DIMORA on a trip to Atlantic City. DIMORA asked BE10 if he (DIMORA) should go. BE10 questioned, "On Good Friday?" DIMORA confirmed they would travel on Good Friday. BE10 told DIMORA to use his judgment and cautioned DIMORA, as long as you go with NEIHEISER, you might as well "publish it on CNN." BE10 said, "Oh my God, [DIMORA]. God love him he can't shut his f--in' mouth. I mean he's brutal." DIMORA said that is why he is nervous.

345.    On or about March 11, 2008, DIMORA caused to be deposited into his joint checking account, a check in the amount of $3,600 drawn on NEIHEISER's account and made

95

payable to Lori Dimora, who was DIMORA's wife.

346.    On or about March 12, 2008, DIMORA asked Gabor to call NEIHEISER regarding the Atlantic City trip. NEIHEISER wanted five people to fill the plane, and they discussed possible travel companions.

347.    On or about March 19, 2008, DIMORA confirmed that Russo definitely did not want to go to Atlantic City. Russo expressed concern about going on the trip because the media had been inquiring about BE13. DIMORA said that it was not worth it, considering their upcoming trip to Las Vegas. Russo was concerned that they would blow a couple thousand and then would be disappointed when they did not have that money in Las Vegas. Russo suggested that DIMORA tell NEIHEISER to hire a limo to drive them to Mountaineer casino.

348.    On or about April 4, 2008, NEIHEISER told DIMORA, "Russo wanted to go. You wouldn't let him go." DIMORA laughed and said, "I wouldn't let him go?" NEIHEISER responded, "He said yeah, [DIMORA] squished the trip." DIMORA said, "Oh, he didn't wanna go. I was the only one . . . me and Michael [Gabor] were the only two that wanted to go. . . . but let's do it again. Let's you know, we're going in uh, uh . . . Vegas." NEIHEISER told DIMORA to have fun in Las Vegas, "get your money back and then we'll reload the trip and we'll go up to the East Coast some time in the Spring." DIMORA replied, "Definitely, please."

349.    On or about May 5, 2008, BE10 told DIMORA, "NEIHEISER said he might want to stop out tomorrow night. So . . . maybe I'll give you a jingle," and then added, "That's a major sponsor. That's serious." DIMORA responded, laughing, "I know."

## EXECUTION OF THE SCHEME

350.    On or about the dates listed below, in the Northern District of Ohio and elsewhere, DIMORA, NEIHEISER and others, for the purpose of executing the above-described scheme and artifice, caused to be transmitted by means of wire communication, in interstate commerce, writings, signs, signals, pictures, and sounds, including the following:

| Date | Description |
|---|---|
| February 17, 2008 | Telephone call from BE10 in Florida to DIMORA in the Northern District of Ohio. |
| March 2, 2008 | Telephone call from BE10 in Florida to DIMORA in the Northern District of Ohio. |
| March 3, 2008 | Telephone call from BE10 in Florida to DIMORA in the Northern District of Ohio. |

All in violation of Title 18, United States Code, Section 1349.

The Grand Jury further charges:

### COUNT 20
(Conspiracy to Commit Bribery Concerning Programs Receiving Federal Funds,
18  U.S.C. § 371)

351.    Paragraphs 1-3, 14, 16, 25, 28, 30-31, 40, 47, 51-52, 55-56, 63, 74, 79 and 83 of this Indictment are re-alleged and  incorporated by reference as if fully set forth herein.

352.    Pumper and DAS participated in renovating the Parkview Apartments (the former Allerton Hotel) located in downtown Cleveland, Ohio for low income housing.  Pumper also had a financial interest in the project which was financed by HUD, County loans and other means.

353.     The County was a government agency as that term is defined in Title 18, United

States Code, Section 666(d)(2), that received benefits in excess of $10,000 during the years July

31, 2004 through July 30, 2005, July 31, 2005 through July 30, 2006, July 31, 2006, through July

30, 2007, and July 31, 2007 through July 30, 2008 under a Federal program involving a grant,

contract, subsidy, loan, guarantee, insurance and other form of Federal assistance.

THE CONSPIRACY

354.     Beginning in or about 2004 and continuing until on or about July 28, 2008, the

exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division

and elsewhere, Defendants JAMES C. DIMORA and MICHAEL D. GABOR, and Steven

Pumper (not charged herein) and others known and unknown to the Grand Jury, did knowingly

and intentionally conspire, combine, confederate and agree to commit an offense against the

United States, that is bribery concerning programs receiving federal funds, in violation of Title

18, United States Code, Sections 666(a)(1)(B) and (a)(2).

OBJECTS OF THE CONSPIRACY

355.     It was an object of the conspiracy that DIMORA, assisted by GABOR in some

instances, corruptly solicited and accepted for the benefit of any person things of value from

Pumper, DAS, DAS Development and Green-Source, DIMORA and GABOR acting with the

intent that DIMORA be influenced and rewarded in connection with a business, transaction and

series of transactions of the County valued at $5,000 or more in each of the years July 31, 2004

through July 30, 2005, July 31, 2005 through July 30, 2006, July 31, 2006, through July 30,

2007, and July 31, 2007 through July 30, 2008.  The things of value included, among other

98

things, free and discounted home improvements, cash, meals, commissions and entertainment. The County business included County real estate projects, real estate acquisitions, the award and administration of construction projects, loans, judicial proceedings and other County business, both as requested and as future opportunities arose.

356.    It was a further object of the conspiracy that Pumper, DAS, DAS Development and Green-Source, with the assistance of GABOR in some instances, corruptly gave, offered and agreed to give to DIMORA things of value, GABOR, Pumper, DAS, DAS Development and Green-Source, acting corruptly with the intent to influence and reward DIMORA in connection with the business, transaction and series of transactions alleged in paragraph 355.

357.    It was a further object of the conspiracy that Pumper used his access to DIMORA to ingratiate himself with others in an effort to advance Pumper's interests.

358.    It was a further object of the conspiracy that DIMORA and his co-conspirators concealed, attempted to conceal and encouraged others to conceal from the public and from law enforcement his corrupt relationship with Pumper.

## MANNER AND MEANS

It was part of the conspiracy that:

359.    In or about 2004 and 2005, DIMORA requested that Pumper construct a large roof over a patio and a bathhouse at DIMORA's residence. Pumper arranged for DAS to perform the work, valued at approximately $31,977 (above and beyond amounts DIMORA paid directly to DAS suppliers and subcontractors). DAS did not bill DIMORA for the work DAS performed and caused to be performed, and DIMORA did not pay for that work in 2004 or 2005.

99

360. In or around the Fall of 2004, DIMORA agreed to assist Pumper in obtaining for DAS a County construction management contract valued at approximately $24,842.

361. On or about September 26, 2006, BE8 offered to sell a parking garage to the County for approximately $5,250,000. Sometime in 2006, the exact date unknown to the Grand Jury, BE8 asked Pumper to assist BE8 with problems that were delaying BE8's sale of the parking garage to the County. Pumper offered DIMORA approximately $35,000 in cash if DIMORA facilitated the sale. DIMORA agreed and accepted approximately $33,000 in cash from Pumper in installments ending in approximately May 2008.

362. From on or about October 23, 2006 to in or about March 2008, DIMORA used his influence to assist Pumper in obtaining County loans for the redevelopment of the Parkview Apartments (hereinafter "Parkview loan") and an extension on the Parkview loan.

363. In or about 2007, DIMORA requested that Pumper construct a grill area, barbecue shelter, patio floor and roof at DIMORA's residence. Pumper caused DAS to perform the work, valued at approximately $27,225 (above and beyond amounts DIMORA paid directly to DAS suppliers and subcontractors). DAS did not bill DIMORA for the work DAS performed and caused to be performed, and DIMORA did not pay for that work in 2007.

364. Sometime between in or around June 2007 and December 2007, DIMORA, at Pumper's request and in an attempt to expedite Pumper's divorce proceedings, called the chambers of PO8, the judge assigned to Pumper's divorce case.

365. Beginning at a time unknown to the Grand Jury and continuing through 2008, BE8 sought HUD financing for rehabilitating two apartment buildings he owned on the west side

of Cleveland. He also sought a HUD commitment guaranteeing HUD-subsidized tenants. BE8 asked Pumper, who expected DAS would obtain the construction work on the rehabilitation project, to obtain DIMORA's assistance with HUD. Specifically, BE8 wanted DIMORA to influence two federal officials' offices to intercede with HUD on BE8's behalf. Pumper agreed to approach DIMORA. Between on or about February 12, 2008 and on or about May 6, 2008, and at Pumper's request, DIMORA agreed to assist and caused his staff to make calls to two federal officials' offices.

366.    From approximately December 2007 or January 2008, through in or about March or April 2008, the exact dates unknown to the Grand Jury, DIMORA, Pumper and GABOR agreed that DIMORA would use his County position to assist Green-Source, Pumper and GABOR, in obtaining public contracts and subcontracts, and that DIMORA would be compensated for his efforts. Pumper, DIMORA and GABOR discussed Green-Source employing GABOR to solicit work for Green-Source. They contemplated that GABOR would use DIMORA's influence over private contractors and various public officials at the County and municipal levels to obtain contracts and subcontracts for Green-Source. Under the plan, GABOR would receive a base salary plus commissions from Green-Source and would give DIMORA a percentage of those commissions. It was further contemplated between Pumper and GABOR that when DIMORA retired from his position as County Commissioner, Green-Source would retain DIMORA as a consultant.

367.    From on or about December 18, 2007 through on or about April 9, 2008, DIMORA used his official influence to support an application for an approximately $200,000

101

"Brownfield" loan and an approximately $800,000 Economic Redevelopment Loan for the Green-Source building on Ivanhoe Road in Cleveland, Ohio.

368.    On or about January 4, 2008, at the request of Pumper, DIMORA recommended to BE7 that Business 5 use DAS as a preferred contractor on two downtown Cleveland development projects, both of which projects involved the County.

369.    In or about April and May 2008, DIMORA used his influence with Judge Bridget McCafferty to cause McCafferty to expedite scheduling and holding a settlement conference in a case in which DAS was a party (hereinafter "the DAS case").

370.    On or about May 23, 2008, when DIMORA learned that Pumper was under federal investigation for bribing PE37, a City of Cleveland building inspector, DIMORA caused to be written the first in a series of checks payable to DAS for the work DAS had performed on his residence in prior years.

371.    On or about May 25, 2008, Pumper created a Construction Agreement purporting to reflect a verbal agreement of October 10, 2005 between DIMORA and DAS for work DAS performed at the DIMORA residence, and arranged to have the Construction Agreement delivered to DIMORA through GABOR.

372.    On numerous occasions during times material to this Count of the Indictment, Pumper paid and caused DAS and DAS Development to pay for entertainment, dinners and drinks for DIMORA and his friends and family.

<u>OVERT ACTS</u>

373.    In furtherance of the conspiracy, and to effect the objects thereof, DIMORA, GABOR, Pumper and others committed the following overt acts in the Northern District of Ohio:

A.    On or about October 7, 2004, Pumper caused DAS to purchase supplies for use at the DIMORA residence.

B.    On or about November 16, 2004, DIMORA voted to approve a County Department of Central Services contract with DAS in the amount of approximately $24,842 for consultant engineering services on the Courthouse Square Renovation Project.

C.    On or about November 17, 2005, Pumper caused DAS to purchase supplies for use at the DIMORA residence.

D.    On or about October 23, 2006, DIMORA voted to recommend two Brownfield Redevelopment Fund loans, each in an amount not-to-exceed $1,000,000 for the Parkview Apartment Project.

E.    On or about March 20, 2007, Pumper caused DAS Development to distribute to DIMORA eight tickets for the March 25, 2007 Cleveland Cavaliers game, the tickets valued at approximately $2,400.

F.    On or about May 23, 2007, DIMORA instructed County staff to place the purchase of the BE8 parking garage on the agenda for Tuesday, May 29, 2007.

G.    On or about May 29, 2007, DIMORA voted to approve the County's purchase of BE8's parking garage for approximately $5,145,000.

H.     On or about June 27, 2007, Pumper caused DAS to pay a contractor $1,250 for work done on the DIMORA residence.

I.     On or about September 1, 2007, Pumper caused DAS Development to distribute to DIMORA tickets to a Cleveland Indians game.

J.     On or about December 15, 2007, GABOR said to Pumper that GABOR's employment at Green-Source would be great for "everybody."

K.     On or about December 17, 2007, Pumper informed DIMORA he had tickets for him to a Cleveland Cavaliers game.

L.     On or about December 20, 2007, Pumper caused DAS Development to distribute to DIMORA four tickets for the December 20, 2007 Cleveland Cavaliers game, the tickets valued at approximately $780.

M.     On or about January 4, 2008, as part of Pumper's efforts to have DIMORA assist DAS obtaining contracts with BE7's company, Pumper told BE7, "I was just talking to [DIMORA] the other day and we wanted to grab some lunch with you or dinner and wanted to see how your schedule was coming up next week and, so I can coordinate that with him." BE7 asked what was "going on" with DIMORA. Pumper replied, "Uh, just you know, with the County stuff and you know, just he just wants to break a little bread with you a little bit. So . . . we just wanted to try and do that sometime next week if that's possible." Pumper and BE7 agreed to coordinate it with DIMORA.

N.     On or about January 8, 2008, DIMORA voted to authorize the County Department of Development to issue to "1170 Ivanhoe, LLC for various projects, located at 1170

104

Ivanhoe Road, Cleveland [the Green-Source building]" loans "a) in the amount not-to-exceed
$200,000 for a Brownfield Redevelopment Fund Project, b) in the amount not-to-exceed
$800,000 for a Commercial Redevelopment Fund Project."

        O.     On or about January 15, 2008, Pumper signed a purchase order authorizing
DAS to pay Beacon Metal Fabricators approximately $7,500 for work that had been performed
on the DIMORA residence in 2007.

        P.     On or about January 18, 2008 at approximately 3:34 p.m., GABOR and
Pumper discussed DIMORA approving GABOR's plan to work at Green-Source.

        Q.     On or about January 18, 2008, Pumper met GABOR and DIMORA at
Green-Source for a walk-through.

        R.     On or about January 19, 2008, GABOR and Pumper had a conversation in
which GABOR told Pumper that DIMORA was "cool" with GABOR working at Green-Source.
Pumper told GABOR that DIMORA should do what he could to help GABOR while DIMORA
was "still in power."  GABOR responded that DIMORA "will be rewarded with it."

        S.     On or about January 22, 2008, Pumper and GABOR talked about a
possible public project for Green-Source in a suburb where GABOR's relative was a public
official.  Pumper and GABOR discussed how GABOR could earn commissions on the project.
GABOR said, "Alright, well I don't want to talk now but I mean."  Pumper attempted to interrupt
and then GABOR said, "I'll treat him like JIM [DIMORA], you understand?"

        T.     On or about February 4, 2008, Pumper told GABOR to relay a message to
DIMORA that Pumper wanted DIMORA to ask the director of a County agency to do an official

act in connection with Pumper's divorce.

U.    On or about February 6, 2008, GABOR told Pumper that DIMORA needed the case number and that DIMORA would call that day or the next.

V.    On or about February 8, 2008 at approximately 11:55 a.m., Pumper and GABOR discussed their plan to have DIMORA approach PE10 on Green-Source's behalf.

W.    On or about February 11, 2008 GABOR and PUMPER discussed their efforts to have DIMORA insert Green-Source products as a required part of the bid for a proposed County project.

X.    On or about February 20, 2008, GABOR and Pumper had a conversation in which GABOR reported that he had talked with DIMORA about getting Green-Source's products spec'd in the building.  GABOR said DIMORA offered to have lunch with PE10 and asked Pumper if he wanted to do that on Monday or Tuesday.

Y.    On or about February 27, 2008, DIMORA had a conversation with PE19 about Pumper needing an extension on the Parkview loan.  DIMORA sought advice from PE19 about which County officials the Parkview "folks" should meet to discuss obtaining an extension.  PE19 named two individuals and asked if DIMORA wanted PE19 there.  DIMORA replied, "Well . . . only because I'm sure they're not going to be able to tell them yes or no on their request."  PE19 said, "If you don't mind, let me have my staff there and tell them they gotta report back to me, and then we can sit there and think about what we want to do and I could be the prick if you need a prick."  DIMORA responded, "Okay.  Well I'm okay with giving them an extension, uhm . . . and again they're said they're willing to pay the interest on the extension . . .

106

they're not . . ." PE19 said the County had done that for a restaurant and "affordable housing is an easier thing to do than a restaurant . . . you tell me where and when and I'll have them there. . . . Period. If it comes from you, it's even better than if it's coming from me."

    Z.  On or about March 3, 2008 at approximately 4:34 p.m., DIMORA had a conversation with PE11 in which he expressed frustration that County employees had not yet scheduled the meeting on the Parkview extension.

    AA.  On or about March 4, 2008, DIMORA wrote a note to PE11 and PE18 on a printed e-mail message about the Parkview extension instructing them to make sure Pumper was "called on this meeting date and time above and that this is the meeting he wanted on the Allerton Project, not Parkview Project, and advise me." He also wrote that he wanted two particular County employees "in attendance" at the meeting.

    BB.  On or about March 3, 2008 at approximately 2:38 p.m., PUMPER discussed a potential Green-Source business lead with GABOR and said they do "retirement facilities, which is perfect for Green-Source." PUMPER told GABOR, "Set this up . . . me, you, JIMMY [DIMORA] and him, and have them start to put that stuff into play for us." GABOR replied, "Ok, now wait a minute, why JIM [DIMORA]?" PUMPER replied, "Well, because you know, [the business man] likes JIMMY [DIMORA], you know and maybe if [the business man] needs something he can talk to JIMMY, something like that you know." GABOR replied, "Ok, but JIM [DIMORA] doesn't really have nothing to do with it right? Just to have him there, right?" PUMPER stated, "Yeah, just to have him there."

CC.     On or about March 3, 2008 at approximately 4:26 p.m., Pumper had a conversation with DIMORA in which Pumper mentioned an east side Neighborhood Family Services Center ("ESNFSC") as being a "perfect" project for Green-Source. DIMORA explained the positions various politicians were taking on the project and then said, "I will try and nail it down and see where its at." Pumper responded, "As long as we know what direction it's going and that way we can like have MICHAEL G [GABOR] over there, kinda contact the guys and try to sit down with their architects."

DD.     On or about March 3, 2008 at approximately 4:42 p.m., PE11 reported to DIMORA that there was no answer for the ESNFC.

EE.     On or about March 5, 2008, DIMORA and Pumper had a conversation in which DIMORA told Pumper the meeting with Parkview/Allerton representatives had been scheduled for March 10th. Pumper told DIMORA that he needed the loan moved out about five to ten years. DIMORA replied, "Five?. . . . I told them maybe give' em . . . add maybe one or two." DIMORA then stated, "Well have the meeting and then let me see what, you know, what I can do with it."

FF.     On or about March 10, 2008, Pumper met with County employees to discuss an extension of the Parkview loan.

GG.     On or about March 12, 2008, Pumper, DIMORA and GABOR met with PE10 at Delmonico's restaurant to promote Green-Source products for the JJC.

HH.     On or about March 14, 2008 at approximately 8:08 a.m., Pumper had a conversation with a Green-Source employee about DIMORA's influence over PE10 with respect

to the JJC.

      II.      On or about Friday, March 14, 2008, Pumper gave PE10 a tour of Green-Source.

      JJ.      On or about March 14, 2008 at approximately 10:59 a.m., GABOR and Pumper discussed DIMORA's role in assisting Green-Source with the JJC.

      KK.      On or about March 16, 2008, PUMPER and GABOR had a conversation about whether they needed DIMORA "to do anything" to assist Green-Source regarding a pending County project.

      LL.      On or about March 21, 2008, GABOR and Pumper had a conversation about DIMORA's concerns regarding GABOR's attendance at a meeting that DIMORA was arranging for Pumper and BE25 regarding Green-Source working on the JJC.

      MM.      On or about March 26, 2008 at approximately 1:03 p.m., GABOR and Pumper had a conversation in which Pumper stated that he was working on the addendum for the JJC. Pumper said, "We saved them close to about $2 million dollars." GABOR responded, "That's exactly what they figured, that is exactly what JIM [DIMORA] said, 2 to 3 million."

      NN.      On or about March 26, 2008 at approximately 11:58 a.m., Pumper and DIMORA had a conversation in which Pumper asked DIMORA about union reaction to Green-Source products in the JJC. Pumper pointed out that although the Masons might lose some of the work, it "would increase the Carpenters' role in the job." Pumper asked if DIMORA would have a problem with that. DIMORA said, "No. Why do you think they're going to b—ch about it?" Pumper replied that the Masons might "b—ch" but the Carpenters would "love it."

DIMORA said Pumper's challenge was to convince the general contractor to use Green-Source. DIMORA said the savings sounded good and said he would "tell them to call the Carpenters." Pumper said the Carpenters would be loving it.  DIMORA said that the individual at the Carpenters was a "bigger pain in the a-- than the other guy [individual at the Masons' Union]." Pumper agreed.

OO.   On or about March 26, 2008, DIMORA told Pumper that he saw the County had given a three-year extension on the Parkview loan.  Pumper thanked DIMORA who responded,  "Yeah, so that worked out good."

PP.   On or about March 31, 2008 at approximately 3:44 p.m., DIMORA told PE18, "I guess Steve Pumper wants a meeting with [BE25 regarding Green-Source] . . . . So try to tie it in if Steve Pumper's available tomorrow.  I'm going to be at Delmonico's."

QQ.   On or about March 31, 2008 at approximately 5:15 p.m., Pumper asked DIMORA what he was doing.  DIMORA replied in a jocular manner, "Oh what the f–k, I'm doin' nothing, I'm trying to make calls, make a living, help my friends make more money than they already got."  Later in the conversation, DIMORA told Pumper that DIMORA was trying to arrange a meeting for the next day at Delmonico's restaurant with BE25.

RR.   On or about April 1, 2008 at approximately 9:00 a.m., BE25 and Pumper had a conversation about DIMORA asking BE25 to attend a meeting at Delmonico's restaurant regarding the JJC.  Pumper said, "We'll [DIMORA and I] guide you through a couple of things and then let you take it from there."

SS.     On or about April 1, 2008, Pumper, DIMORA and BE25 met at Delmonico's restaurant to discuss BE25 using Green-Source products for the JJC.

TT.     On or about April 2, 2008, BE25 and Pumper had a conversation in which BE25 said, "Just to let you know, in follow up to yesterday, our team is writing the spec for you guys [Green-Source]."

UU.     On or about April 22, 2008, DIMORA and Pumper had a conversation in which DIMORA stated that DIMORA had a "nice talk with [McCafferty about the DAS case]" and would let Pumper know what was "going on with that."

VV.     On or about April 28, 2008, DIMORA and Pumper had a conversation in which DIMORA told Pumper that McCafferty's bailiff would be calling Pumper to discuss the "sub-contractor" issue in the DAS case and to get the particulars to McCafferty's staff attorney "to try to get the thing worked out for you." DIMORA said he had told the bailiff that he thought "the other issue is okay, but I said if it's not, when he calls you, you can talk to him about that, too. . . . Let me know what's shaking after you talk to him. If there's something more we need to do or I need to talk to somebody you know what I mean after you get the conversation and the opinion back."

WW.     On or about April 28, 2008, McCafferty had a private telephone conversation with Pumper about the DAS case, in which Pumper and McCafferty discussed the status of the case and McCafferty agreed to schedule a settlement conference.

XX.     On or about May 2, 2008, McCafferty and Pumper had a private telephone conversation about the DAS case in which McCafferty said, referring to a settlement conference

111

she had held earlier in the day, "I know it's more than you wanted to pay but I hope you can live with it." Pumper replied, "You know what, I mean we're going to spend another 20,000, 30,000 getting this thing done anyhow." McCafferty stated, "I was trying to get it out at 175 [$175,000.00], but I just couldn't get it done." Pumper replied, "Yeah, that's okay. Listen, hey, you did a great job for me, so, um, appreciate that." Later in the call, McCafferty stated that she would see Pumper soon, and Pumper replied, "Next fund raiser."

YY.    On or about May 28, 2008, five days after the FBI had confronted Pumper, DIMORA told BE29, "[W]ould you tell [Pumper] to please have his company send over this invoice on this. . . ." DIMORA stated, "I sent a check in, just so there is enough money on account towards the uh project.  You know I paid for, as I was telling you for the bigger addition but I just want to. . . . You know I don't want to have nothing hanging out there that could come back to hurt him or me, you know what I mean," and that DIMORA thought it would be "helpful if they saw money towards it." BE29 indicated that he would relay the message to Pumper.

All in violation of Title 18, United States Code, Section 371.

The Grand Jury further charges:

## COUNT 21
(Bribery Concerning Programs Receiving Federal Funds, 18 U.S.C. §§ 666(a)(1)(B) and 2)

374.    Paragraphs 1-3, 14, 28, 47, 74, 79 and 352 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

375.    The County was a government agency as that term is defined in Title 18, United States Code, Section 666(d)(2), that received benefits in excess of $10,000 during the year May 24, 2007 through May 23, 2008 under a Federal program involving a grant, contract, subsidy,

112

loan, guarantee, insurance and other form of Federal assistance.

376.    Beginning on or about May 24, 2007 and continuing until on or about May 23,

2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern

Division and elsewhere, Defendant JAMES C. DIMORA did corruptly solicit, demand, accept

and agree to accept for the benefit of any person things of value from Pumper, DAS, and DAS

Development, acting with the intent to be influenced and rewarded in connection with any

business, transaction and series of transactions of the County involving any thing of value of

$5,000 or more; that is, among other things, the Parkview loan extension, the County's purchase

of the BE8 parking garage, the DAS case, and Pumper's litigation in the Cuyahoga County

Domestic Relations Court.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

The Grand Jury further charges:

COUNT 22

(Bribery Concerning Programs Receiving Federal Funds,18 U.S.C. §§ 666(a)(1)(B) and 2)

377.    Paragraphs 1-3, 16, 28, 30, 47 and 74 of this Indictment are re-alleged and

incorporated by reference as if fully set forth herein.

378.    The operations of Green-Source affected interstate commerce.

379.    The County was a government agency as that term is defined in Title 18, United

States Code, Section 666(d)(2), that received benefits in excess of $10,000 during the calendar

year 2008 under a Federal program involving a grant, contract, subsidy, loan, guarantee,

insurance and other form of Federal assistance.

113

380.    Beginning in or around January 2007 and continuing until on or about May 23,

2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern

Division and elsewhere, Defendant JAMES C. DIMORA, aided and abetted by Defendant

MICHAEL D. GABOR, did corruptly solicit, demand, accept and agree to accept for the benefit

of any person things of value from Pumper and Green-Source, acting with the intent to be

influenced and rewarded in connection with any business, transaction and series of transactions

of the County involving any thing of value of $5,000 or more; that is, among other things, the use

of Green-Source products in the JJC project and other County-funded projects.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

The Grand Jury further charges:

COUNT 23
(Hobbs Act, 18 U.S.C. § 1951)

381.    Paragraphs 1-6, 14-15, 28 and 74-75 of this Indictment are re-alleged and

incorporated by reference as if fully set forth herein.

382.    From sometime in early 2004 and continuing through on or about July 28, 2008,

the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern

Division and elsewhere, Defendant JAMES C. DIMORA did knowingly obstruct, delay and

affect and attempt to obstruct, delay and affect commerce and the movement of articles and

commodities in commerce by extortion; that is DIMORA obtained property not due to him or his

office, namely, cash, free and discounted remodeling work on his residence, meals, sports tickets

and entertainment, from Steven Wayne Pumper, DAS, and DAS Development, with their

114

consent, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

## COUNT 24
(Hobbs Act Conspiracy, 18 U.S.C. §§ 1951 and 2)

383.    Paragraphs 1-3, 5-6, 16, 28, 30 and 74-75 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

384.    At all times material hereto, the operations of Green-Source affected interstate commerce.

385.    From in or around late 2006 and continuing through on or about early May 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants JAMES C. DIMORA and MICHAEL D. GABOR, and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to obstruct, delay and affect commerce and the movement of articles and commodities in commerce, by extortion; that is, DIMORA and GABOR solicited property for DIMORA not due to him or his office, namely, commissions, from Pumper and Green-Source, with their consent, under color of official right.

All in violation of Title 18, United States Code, Sections 1951 and 2.

115

The Grand Jury further charges:

<u>COUNT 25</u>
(False Statements to Law Enforcement, 18 U.S.C. § 1001)

386.    Paragraphs 28-29, 31 and 74 of this Indictment are re-alleged and  incorporated by reference as if fully set forth herein.

387.    Beginning in or around April, 2008, the FBI, part of the executive branch of the Government of the United States, and acting in a matter within its jurisdiction, was investigating James C. Dimora for soliciting and accepting things of value from Steven Pumper in return for Dimora using his official position to influence litigation in Letter Perfect Group, Inc. v. DAS Construction Co. et al, Case No. CV-08-651541, (hereinafter "DAS case"), pending before Defendant Judge BRIDGET M. MCCAFFERTY, in violation of federal law.

388.    Beginning in or around July 2008, the FBI, part of the executive branch of Government of the United States, and acting in a matter within its jurisdiction, was investigating Frank P. Russo and others for Russo soliciting and accepting things of value from another in return for Russo using his official position to influence litigation in Anthony J. Debaltzo v. Joseph N. Consolo, Case No. CV-08-657958, pending before MCCAFFERTY, in violation of federal law.

389.    On or about September 23, 2008, Special Agents of the FBI interviewed MCCAFFERTY in connection with the investigations described above.

<u>The Offense</u>

390.    On or about September 23, 2008, in the Northern District of Ohio, Eastern Division, Defendant BRIDGET M. MCCAFFERTY knowingly and willfully made the following

116

material false statements in a matter within the jurisdiction of the executive branch of the Government of the United States: (1) MCCAFFERTY denied that Dimora attempted to intervene in any cases before her court; (2) when asked if MCCAFFERTY called Pumper after a settlement conference (concerning the DAS case) and told Pumper that she tried to settle the case for less money, MCCAFFERTY denied the conversation occurred; (3) MCCAFFERTY denied that Frank Russo ever spoke to her about any cases in her court; (4) MCCAFFERTY denied giving Frank Russo any special consideration with regard to any cases before her; (5) MCCAFFERTY indicated that her only conversations with Russo about her court would have been Russo or Dimora's remarks that they heard from attorneys that she was doing a good job as a judge; well knowing at the time that she made those statements to Special Agents of the FBI that such statements were false.

All in violation of Title 18, United States Code, Section 1001.

The Grand Jury further charges:

COUNT 26
(Conspiracy to Obstruct Justice, 18 U.S.C. § 1512, in violation of 18 U.S.C. § 371)

391.    Paragraphs 1, 14, 23-24, 28-30, 34, 63, 68, 70, 72, 74, 78 and 84 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

392.    From in or around December 2007 through the date of the filing of this Indictment, the FBI and IRS were investigating, among other things, whether individuals and private companies had provided things of value, including free and discounted home improvements, to DIMORA and other public officials in return for their promise to perform official acts. In the course of that investigation, federal grand jury subpoenas from the Northern

District of Ohio were issued.

393.    On or about May 23, 2008, in one of the first overt steps in the investigation described above, FBI agents interviewed Steven Pumper about Pumper bribing PE37 and sought Pumper's cooperation in an investigation of municipal public corruption.  Although the interviewing agents did not mention the County or any County official, Pumper volunteered, "I know you guys are thinking of DIMORA and Russo and them."

394.    On or about the morning of May 26, 2008, Attorney 5, then representing Pumper, learned that a grand jury subpoena would be forthcoming requiring DAS and Pumper to produce documents.

395.    On or about May 29, 2008, and in furtherance of the investigation described above, the United States served a grand jury subpoena on DAS requiring production of "all documents reflecting any financial relationship between DAS Construction and any public official" and also served a grand jury subpoena on Pumper requiring production of  "all documents reflecting any financial relationship between DAS and any public official."

## THE CONSPIRACY

396.    Beginning on or about May 23, 2008, and continuing until on or about June 20, 2010, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants JAMES C. DIMORA, MICHAEL D. GABOR, and ROBERT W. RYBAK, and Steven Wayne Pumper (not charged herein), John Kevin Kelley (not charged herein), Nicholas Zavarella (not charged herein), and others known and unknown to the Grand Jury, did knowingly and intentionally conspire, combine, confederate and agree together and with each other and with other persons known and unknown to the Grand Jury, to commit an

offense against the United States, namely, to violate Title 18, United States Code, Section 1512(b).

## OBJECT OF THE CONSPIRACY

397.    It was the object of the conspiracy that DIMORA, RYBAK, GABOR, Kelley, Pumper, Zavarella and others known and unknown to the Grand Jury, concealed, attempted to conceal and encouraged others to conceal from law enforcement and the Grand Jury the fact that DIMORA had solicited and accepted bribes, kickbacks and gratuities.

## MANNER AND MEANS

It was part of the conspiracy that:

398.    In order to make it appear that the work performed on DIMORA's house was not free and discounted, and did not constitute bribes or gratuities, DIMORA, Pumper, Zavarella and others created and caused to be created documents related to work performed at DIMORA's residence.

399.    During the course of the conspiracy and continuing through on or about June 20, 2010, DIMORA caused to be sent a series of checks drawn on Lori and JAMES DIMORA's personal checking account made payable to DAS, ZBC and others who performed work at DIMORA's residence.

400.    DIMORA, GABOR, RYBAK, Pumper and others influenced and attempted to influence statements of witnesses about the work performed at DIMORA's residence and other things of value provided to DIMORA.

401.    DIMORA and Pumper communicated through intermediaries, including GABOR.

## OVERT ACTS

402.    In furtherance of the conspiracy, and to effect the object thereof, DIMORA, GABOR, RYBAK, Pumper, Zavarella, Kelley and others committed the following overt acts in the Northern

District of Ohio and elsewhere:

      A.    On or about May 23, 2008, Pumper and BE29 agreed that BE29 would notify DIMORA and others that Pumper had been confronted on that date by FBI agents investigating Pumper's bribery of PE37.

      B.    On or about May 23, 2008, DIMORA caused to be issued a check drawn on Lori and JAMES DIMORA's personal checking account made payable to DAS in the amount of $600.

      C.    On or about May 23, 2008, DIMORA caused to be issued a check drawn on Lori and JAMES DIMORA's personal checking account made payable to ZBC for $500.

      D.    On or about May 23, 2008, DIMORA caused to be issued a check drawn on Lori and JAMES DIMORA's personal checking account made payable to Salva Stone Design for $250.

      E.    On or about May 24, 2008 at approximately 11:38 a.m., DIMORA told Russo he was en route to Your's Truly restaurant and said that if BE29 arrived, Russo should pull him aside for a minute.  Russo responded, "I know.  The mother told me yesterday."  DIMORA instructed Russo not to talk on the phone.

      F.    On or about May 24, 2008 at approximately 12:48 p.m., DIMORA and GABOR discussed meeting the following afternoon.

      G.    On or about May 25, 2008, Pumper created a Construction Agreement purporting to reflect a verbal agreement of October 10, 2005 between DIMORA and DAS for work DAS performed at the DIMORA residence, and arranged to have the Construction Agreement delivered to DIMORA through GABOR.

H.    On or about May 26, 2008 at approximately 5:13 p.m., DIMORA called Kelley to give him a "heads up on something coming up maybe this week."

I.    On or about May 26, 2008 at approximately 8:40 p.m., Kelley told RYBAK that he needed to see him. RYBAK told Kelley to come over to RYBAK's house.

J.    On or about May 27, 2008, GABOR asked DIMORA, "Is everything okay?" DIMORA replied, "So far, we'll see what happens this week." GABOR informed DIMORA that he was going to see RYBAK. DIMORA said that it was okay for GABOR to meet with RYBAK. DIMORA added, "The other guy [Kleem] we talked about maybe you should stop and see." GABOR replied, "Get it done with?" DIMORA agreed. GABOR asked, "Just tell him the story right?" DIMORA replied, "Yeah . . . not to broadcast it," and Gabor said, "Right for his own good."

K.    On or about May 28, 2008 at approximately 7:41 a.m., BE29 told DIMORA he was with Pumper. BE29 informed DIMORA that Attorney 5 wanted DIMORA to call him [Attorney 5]. DIMORA asked, "Attorney 5?" BE29 replied, "Yeah, nothing serious. He just wants to let you know a couple things." BE29 gave Attorney 5's telephone number to DIMORA and told DIMORA that Attorney 5 "talked to the U.S. Attorney yesterday" and there was no "real problem, they're [the FBI] just digging." DIMORA responded, "Well, yeah, we knew they they're always . . . aren't they always?" BE29 replied, "He just wants to let you know what's up."

L.    On or about May 28, 2008 at approximately 7:42 a.m., DIMORA called Attorney 5 and while the phone was ringing, DIMORA spoke with someone in the background, saying, "Well I'm not going to say nothing." Attorney 5 then answered the phone and told DIMORA that he would like 15 minutes of DIMORA's time and specified, "It's kind of important." Attorney 5 told DIMORA, "The

121

sooner the better," and agreed to meet DIMORA at DIMORA's residence later that morning.

        M.      On or about May 28, 2008 at approximately 7:45 a.m., DIMORA told BE29, "[W]ould you tell [Pumper] to please have his company send over this invoice on this. . . ." DIMORA stated, "I sent a check in, just so there is enough money on account towards the uh project. You know I paid for, as I was telling you for the bigger addition but I just want to. . . . You know I don't want to have nothing hanging out there that could come back to hurt him or me, you know what I mean." DIMORA stated further that he thought it would be "helpful if they saw money towards it." BE29 indicated that he would relay the message to Pumper.

        N.      On or about May 28, 2008 at approximately 11:46 a.m., Kleem thanked DIMORA for the "message." DIMORA indicated everything was alright so far but he was "always waiting for the other shoe to fall or drop." Kleem replied, "Well there is no other shoe to drop. I think everything is going to be good." At the conclusion of the conversation, Kleem and DIMORA agreed to meet at a later date. Kleem told DIMORA, "Don't worry too much."

        O.      On or about May 28, 2008 at approximately 11:54 a.m., DIMORA called Zavarella.

        P.      On or about May 28, 2008 at approximately 12:12 p.m., RYBAK told DIMORA that he had spoken to GABOR earlier that day. RYBAK said he did not want to discuss it on the telephone, but wanted to speak to DIMORA in person. DIMORA said, "No, I know."

        Q.      On or about May 28, 2008 at approximately 7:22 p.m., GABOR told Kelley that he was socializing with a friend. Kelley handed the phone to DIMORA, who said to GABOR that he thought GABOR was meeting with someone else and wanted an update. GABOR replied, "Exact same

thing." DIMORA asked, "What does he think about me?" GABOR replied, "Zero." DIMORA said,

"Oh, he thinks it's something else?" GABOR replied, "No, he thinks that they were just trying to push

him against a wall and he said, 'F–k you.'" DIMORA said that [Attorney 5] came and that DIMORA did

not want to speak on the phone. GABOR agreed to talked to DIMORA later.

   R. On or about May 28, 2008 at approximately 9:45 p.m., DIMORA, RYBAK and

Kelley met in a post office parking lot and discussed RYBAK's concern about law enforcement

discovering that Local 55 and JATC resources had been used for DIMORA home improvements.

   S. On or about May 28, 2008 at approximately 9:55 p.m., RYBAK and Kelley told

each other in a jocular manner, "To the best of my recollection. I don't recall." RYBAK said, "Hey

listen, on a serious note, ask him [DIMORA] on those fixtures the toilet fixtures, and all that stuff . . .

where's he [DIMORA] gonna say that came from, because I think that came from the Mister Bill

[Neiheiser]. So [unintelligible] be careful with that." Kelley replied, "No, he's gonna . . . tell the truth

that's all that matters. When something's f--ked up, you just fix it. That's it." RYBAK agreed. Kelley

said if you "start lying, you get in trouble."

   T. On or about May 30, 2008, Nicholas Zavarella caused to be sent an invoice from

ZBC to DIMORA in the amount of $6,687 for masonry, labor and material completed as of March 31,

2008.

   U. On or about May 30, 2008 at approximately 6:24 p.m., DIMORA asked Attorney 5

whether a certain person who had recently called DIMORA was with the FBI. Attorney 5 told DIMORA

that the name did not match either of the two business cards the FBI had given to Pumper, but Attorney 5

agreed to check for DIMORA since Attorney 5 did not have the business cards with him and he could not

recall with certainty the name of one of the Agents. During the conversation, Attorney 5 told DIMORA, "No, nothing directed towards your direction." DIMORA responded, "Oh, okay, fine." Attorney 5 continued, "So that's good. I'm not saying it can't change but. . . . " DIMORA said, "Yeah. Right." Attorney 5 added, "The initial one, nothing your way, nothing involving you." DIMORA said, "I uh, so what should we still try to uh get this thing resolved or sit on it?" Attorney 5 replied, "Yeah, let's give it some thought. I think, you know, something should be done. I think he [Pumper] should finish up over there as he [Pumper] planned." DIMORA said, "I mean there is a couple little things that need to be completed, you know, I mean the other thing it too . . . I mean the money can be applied for materials. We know there's materials, you know what I'm saying." Attorney 5 replied, "Right." DIMORA then asked, "Okay, nothing with the County either [Attorney 5]?" Attorney 5 responded, "No, nothing directed that way strictly directed towards my client [Pumper]." At the conclusion of the conversation, Attorney 5 agreed to call if he found out the person DIMORA inquired about was an FBI Agent.

      V.    On or about June 3, 2008, Pumper caused to be sent an invoice from DAS to DIMORA dated May 30, 2008.

      W.    On or about June 30, 2008, DIMORA caused to be issued a check drawn on Lori and JAMES DIMORA's personal checking account made payable to DAS for $600.

All in violation of Title 18, United States Code, Section 371.

The Grand Jury further charges:

## COUNT 27
(Destruction, Alteration, or Falsification of Records in Federal Investigations,
18 U.S.C. §§ 1519 & 2)

403.    Paragraphs 28, 74 and 78 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

## The Obstruction

404.     From on or about May 23, 2008 to on or about January 22, 2010, in the Northern District of Ohio, Eastern Division, Defendant JAMES C. DIMORA, and Nicholas Zavarella (not charged herein), Steven Wayne Pumper (not charged herein) and others known and unknown to the Grand Jury, did knowingly alter, conceal, cover up, falsify and make a false entry in any record, document and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of any matter within the jurisdiction of any department and agency of the United States, and in relation to and in contemplation of any such matter.

All in violation of Title 18, United States Code, Sections 1519 and 2.

The Grand Jury further charges:

## COUNT 28
### (Hobbs Act Conspiracy, 18 U.S.C. § 1951)

405.     Paragraphs 1-3, 5-6, 8, 18-20, 28-29, 34, 41, 52, 57-59, 70 and 85-86 of this Indictment are re-alleged and  incorporated by reference as if fully set forth herein.

406.     Beginning in or around 2007 and continuing until on or about May 29, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants JAMES C. DIMORA and ROBERT W. RYBAK, and John Kevin Kelley (not charged herein), PO9 (not charged herein), and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA and PO9 obtained property not due to them or their offices, from RYBAK, Local 55 and the JATC, with their consent, under color of official right.

125

## OBJECTS OF THE CONSPIRACY

407.    It was an object of the conspiracy that RYBAK, Local 55 and the JATC provided

DIMORA and PO9 with things of value in return for DIMORA and PO9 using their County positions to

benefit RYBAK and others designated by RYBAK, in connection with County personnel issues, both as

requested and as future opportunities arose.  The things of value included free and discounted home

improvements, meals and entertainment, political donations, and organizing a political fundraiser.

408.    It was a further object of the conspiracy that DIMORA and RYBAK concealed and

attempted to conceal the bribes described in this Count of the Indictment from law enforcement and the

public.

## MANNER AND MEANS

It was part of the conspiracy that:

409.    At times, Kelley served as an intermediary among and between RYBAK, DIMORA and

PO9.

410.    On or about February 9, 2008 at approximately 12:56 p.m., Kelley and RYBAK discussed

obtaining a promotion for PE21 which would result in a pay raise.  During the conversation, Kelley

commented how "naive" PE21 was to think she could obtain the job on her own.  RYBAK agreed.

Kelley also instructed RYBAK to use his "resource" to get PE21 the job.  RYBAK indicated he told PE

21, "I can get every one of those three Commissioners to vote you a raise. She goes, 'Yeah right.' I said,

'How much you want to bet?  I'm telling ya I could talk to DIMORA or [PO10] or the other one [PO9]

faster than JIMMY [DIMORA] would do it for me.'" Kelley agreed.  RYBAK then added, "Maybe he's

concerned that we're friends and people are tied in that way. But then again look at Frank [Russo] with

all his friends." Kelley responded, "And well, why is Frank [Russo] as strong as he is? He takes care of his friends." RYBAK said, "Well maybe JIMMY [DIMORA] has to learn that."

411. On or about February 9, 2008 at approximately 5:09 p.m., RYBAK told Kelley how "f--ked" he was because he and DIMORA just left the bar. RYBAK again discussed his bar bill. RYBAK said, "Mine was $160 plus tip. Then we got [another person] drinking. We picked up the drinks afterwards. Guess how much those were." Kelley asked, "How much?" RYBAK replied, "Another $100. We spent 300 f--kin' dollars there today." RYBAK then commented Kelley "laid it on too heavy" when Kelley was talking to DIMORA about the raise for PE21. Kelley replied, "I got JIMMY [DIMORA] right where you want him." Kelley then added, "I said, 'JIMMY [DIMORA], you know you got to take care of this, I want, you know, get her [PE21] ten grand, just, you know and it will help the whole situation.'" RYBAK asked what DIMORA said about the raise. Kelley responded, "He [DIMORA] says he's gonna look at it. He'll figure it out on Monday, what's going on." RYBAK replied, "You got to stay on him now, that's all, okay." Kelley confirmed he understood. RYBAK then said, "Yeah f--k that five grand. Get her ten that's for sure."

412. On or about February 11, 2008, Kelley and RYBAK discussed obtaining County jobs for Local 55 employees. RYBAK explained to Kelley how there used to be a union worker employed at the Engineer's Office, but the worker was fired. RYBAK said it would benefit him (RYBAK) to "get a guy in there." Kelley replied, "Absolutely, let me see what I can do." RYBAK then assured Kelley the union worker hired would be a "political asset" for the Engineer's Office.

413. On or about February 20, 2008, DIMORA had a conversation with PE23, who informed DIMORA that PE21 did not want to move her office to a different building which was a requirement with

127

the promotion, so PE21's boss was going to give PE21 other responsibilities which would result in a comparable pay raise. PE23 then suggested this would make PE21 "happier." DIMORA replied, "If she's happy, that's fine."

414.    On or about February 22, 2008, Kelley and RYBAK discussed coordinating a fundraiser for PO9. Kelley confirmed he spoke to PO9, who already put the fundraiser on his calendar.

415.    On or about March 10, 2008, DIMORA asked PE23 if he received the message regarding PE21. PE23 replied, "Yeah, I took care of it."

416.    On or about March 12, 2008, RYBAK and DIMORA discussed the County hiring Plumber 1 to replace another plumber who left the County. RYBAK inquired if the Commissioners had to approve the hiring of Plumber 1. RYBAK then offered to speak to the other Commissioners in order to keep DIMORA "out of it." DIMORA confirmed that the hiring needed to be passed at a Board of Commissioners meeting. DIMORA then instructed RYBAK to write a letter to the three Commissioners and fax it to DIMORA that evening so he could discuss the hiring with the other Commissioners in the morning. DIMORA said he would initiate the conversation with the other Commissioners and he would say, "Let's help RYBAK out and get the guy [Plumber 1] on." At the conclusion of the conversation, RYBAK and DIMORA discussed their upcoming trip to Las Vegas.

417.    On or about March 13, 2008, DIMORA called PE23 with RYBAK's request to have a worker from the plumbers' union hired at the County. PE23 told DIMORA, "I'll take care of it." DIMORA then encouraged PE23 to lean on a certain County employee to make it happen.

418.    On or about March 13, 2008, DIMORA asked RYBAK, "How many times am I gonna do you a f–ing favor?" RYBAK responded that he already installed the ice machine. RYBAK then asked

what else "do you need," and made a reference to oral sex. DIMORA replied, "Come up with some p--sy, you mother f---er." RYBAK replied that he did not want DIMORA to "go down like Governor Spitzer." DIMORA told RYBAK, "I ain't gonna pay for no p--sy. That's why he went down." RYBAK replied, "Yeah, you'll let Gabor, Kelley and me pay it for you," and then laughed. RYBAK then inquired about a recent County meeting. DIMORA told RYBAK that PE23 told another County employee, "Take care of this. PO10 and DIMORA wants [sic] it. Get it done." RYBAK and DIMORA then discussed the plumbers' union receiving "spots" similar to those the electricians' union received from the County. RYBAK then told DIMORA, "Good man. Okay maybe now you'll get that bun [sexual reference which was previously discussed in the conversation]."

419. On or about March 14, 2008, DIMORA told PE23 about his conversation with RYBAK and then inquired about the plumbers' union receiving spots with the County. PE23 indicated he assigned the request to another County employee and told DIMORA he would follow-up. PE23 then assured DIMORA he [PE23] would "get it done."

420. On or about March 18, 2008, RYBAK told DIMORA, "Remember Spitzer, if I go down, you're going with me." DIMORA replied, "We are all going down together baby." RYBAK responded, "Thank you Spitzer."

421. On or about March 20, 2008, RYBAK spoke to both DIMORA and Gabor and complained about how Gabor and DIMORA treated the plumbers' union international officers the previous evening. During the conversation DIMORA said, "I took care of you again today, you fat mother f—er." RYBAK replied, "About f-cking time. Nine months later."

129

422.    On or about March 21, 2008, RYBAK sent a letter to the County Commissioners recommending Plumber 1 and Plumber 2 to fill two journeyman plumber positions with the County.

423.    On or about March 27, 2008, DIMORA and PO9 both voted in favor of appointing Plumber 1 and Plumber 2 as full-time temporary plumbers with the County.

424.    On or about April 4, 2008, DIMORA invited Kelley to a social gathering that evening and explained that RYBAK was paying.  DIMORA then encouraged Kelley to "let those other guys . . . know."

425.    On or about April 15, 2008 at approximately 3:49 p.m., DIMORA complained to Kelley that PE21 wanted more money.  DIMORA then explained how PE21 applied for a job but did not receive it because the County hired someone from the outside and how they (RYBAK and PE21) are now trying to figure out how to block it and put PE21 in there.  DIMORA then said, "They need another Commissioner."  Kelley suggested RYBAK call PO9 since he was holding a fundraiser for PO9.

426.    On or about April 15, 2008 at approximately 4:12 p.m., DIMORA spoke to PE21, who told DIMORA that she had applied for a position within the County but another candidate was hired.  PE21 was upset about not being selected and about the salary for the new hire.  PE21 confirmed for DIMORA that her raise was on the Commissioners' Agenda for Thursday (04/17/2008).  PE21 informed DIMORA of the salary she wanted and they discussed a way to make that happen.  DIMORA suggested that RYBAK contact PO9, since they would need a "second Commissioner" to approve the salary increase.  DIMORA also offered to have the matter pulled from the Commissioners' Agenda until an agreement was made on the amount of PE21's raise.

130

427.    On or about April 15, 2008 at approximately 4:31 p.m., DIMORA told RYBAK, "You

better deliver," and made a reference to a woman RYBAK offered to provide to DIMORA.  RYBAK told

DIMORA not to help PE21 if it was going to create problems for DIMORA.  DIMORA then inquired

what he would receive from RYBAK.  RYBAK replied, "I always take care of you . . . "  DIMORA then

told RYBAK, "We need to get another Commissioner either way to do this."  DIMORA indicated both he

and PE21 believed PO9 was the "one to go after, 'cause he's on the hook here with his election time."

RYBAK then suggested he could also approach PO10 about PE21's raise because RYBAK knew

someone who was close with PO10.  DIMORA then recommended RYBAK go to PO9 first and then use

PO10 as a "fall back."  DIMORA told RYBAK to inform PO9 that he (DIMORA) was "on board" with

PE21's raise.

428.    On or about April 15, 2008, Kelley spoke to PO9 about PE21's raise.  Kelley informed

PO9 that RYBAK was speaking to PO10 about PE21's raise because RYBAK was uncomfortable talking

to PO9 about PE21's raise since RYBAK was involved in PO9's fundraiser.  PO9 then stated that PE21

would have his vote if she could wait until after the election in November.

429.    On or about April 15, 2008, Kelley informed RYBAK about his conversation with PO9.

According to Kelley, PO9 was willing to give PE21 a raise if DIMORA was "on board" and if they

waited until after the election.  RYBAK expressed frustration about the delay.  Kelley indicated that PO9

wanted to delay PE21's raise because RYBAK was participating in a fundraiser for PO9 and seeking a

raise for PE21 at the same time.

430.    On or about April 15, 2008, RYBAK informed DIMORA that PO9 wanted to delay PE21's

raise until after the election because RYBAK was hosting a fundraiser for PO9.  DIMORA suggested

RYBAK go through PO10.

431. On or about April 17, 2008, RYBAK told DIMORA he had spoken to PE21 the previous evening and she had told RYBAK to tell DIMORA to do what made him comfortable and not to do anything that made DIMORA uncomfortable. DIMORA then discussed different options for PE21's raise and inquired whether PE21 wanted to increase the smaller raise now. RYBAK told DIMORA to let "[PO9] lead the charge because according to Kelley they have an agreement with [PO9]."

432. On or about April 17, 2008, DIMORA told Kelley he hated not to do something for PE21 because RYBAK would complain. Kelley assured DIMORA, "Without you they don't have nothing."

433. On or about April 17, 2008, DIMORA called his office and asked PE11 to pull PE21 from the Commissioners' Agenda.

434. On or about April 30, 2008, DIMORA and a landscaper discussed some plumbing work that needed to be done at DIMORA's house. DIMORA inquired whether RYBAK needed to be present when the plumber did the work. The landscaper indicated RYBAK did not need to be there and informed DIMORA he would come to DIMORA's house later that day to start on the work. DIMORA and RYBAK had a subsequent conversation in which they discussed the work being done at DIMORA's house.

435. On or about May 12, 2008, RYBAK and DIMORA spoke about the ice machine RYBAK delivered to DIMORA's house the previous day. RYBAK asked DIMORA if he would hire PE22.

436. On or about May 12, 2008, DIMORA and Kelley discussed PE22's summer job. DIMORA was concerned PE21 would draw too much attention to PE22's job. DIMORA then explained to PE11 that PE22 wanted to start then rather than waiting until June 1. Kelley complained how difficult

132

it was for him to move PE22's start date up to June 1 because it was two weeks before the summer hiring program started.  DIMORA then suggested he would tell PE11 that if Kelley could not move up the starting date, DIMORA would instruct PE11 to hire PE22, because DIMORA "cannot say no."

437.    On or about May 18, 2008, DIMORA left a voicemail message for RYBAK thanking him for performing plumbing work at DIMORA's house the previous day.  DIMORA then said the ice maker was not working and requested RYBAK come to DIMORA's house to fix it.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

COUNT 29
(Embezzlement or Theft from Labor Unions, 29 U.S.C. § 501(c))

438.    Paragraphs 18 and 70 of this Indictment are re-alleged and  incorporated by reference as if fully set forth herein.

439.    From in or around 2006, through on or about July 16, 2008, in the Northern District of Ohio, Eastern Division, Defendant ROBERT W. RYBAK, while an officer, that is, Business Manager, of Local 55, did embezzle, steal and unlawfully and willfully abstract and convert to his own use and the use of another the moneys, funds, and assets of said labor organization, namely, (1) used Local 55 assets to perform work on RYBAK's property; (2) used Local 55 assets to perform work on the property of RYBAK's friends; (3) used Local 55 assets to entertain RYBAK and his friends; and (4) used Local 55 assets to make a political contribution that benefitted RYBAK's relative.

In violation of Title 29, United States Code, Section 501(c).

The Grand Jury further charges:

## COUNT 30
### (Embezzlement or Theft from Employee Benefit Funds, 18 U.S.C. § 664)

440.　Paragraphs 19-20 and 70 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

441.　From in or around 2006, through in or around 2007, in the Northern District of Ohio, Eastern Division, Defendant ROBERT W. RYBAK, did embezzle, steal, and unlawfully and willfully abstract and convert to his own use and the use of another, moneys, funds, property, and other assets of the JATC, an employee welfare benefit plan subject to Title I of ERISA and of a fund connected with such plan, namely, (1) used JATC assets to perform work on RYBAK's property; and (2) used JATC assets to perform work on the property of RYBAK's friends.

In violation of Title 18, United States Code, Section 664.

The Grand Jury further charges:

## COUNT 31
### (Tampering with a Witness, 18 U.S.C. § 1512(b)(1)(2) &(3))

442.　Paragraphs 28, 70 and 82 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

443.　On or about January 15, 2009, Special Agents from the FBI and the United States Department of Labor, Office of Inspector General, visited RYBAK at the Plumbers Local 55 union hall. At the beginning of the meeting, the agents told RYBAK that he was a target of a federal investigation. RYBAK told the agents that he was aware of the investigation of Dimora and Russo.

134

## The Obstruction

444.    Beginning on or about January 15, 2009 and continuing until on or about June 8, 2009, the exact dates unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division, Defendant ROBERT W. RYBAK did knowingly and corruptly persuade another person and attempt to do so and engage in misleading conduct toward another person with the intent to (1) influence, delay and prevent the testimony of any person in an official proceeding; and (2) cause and induce any person to withhold testimony from an official proceeding; and (3) hinder, delay and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of a Federal offense.

It was part of the obstruction that:

445.    When BE24 showed RYBAK an FBI business card, RYBAK escorted BE24 outside the union office. RYBAK told BE24 that if questioned about work performed for public officials, "All you can tell them, BE24, is . . . everything you ever did he [RYBAK] always said make sure you did it on your own time."

446.    RYBAK told BE24, "If he asks you about Dimora, just say I helped him . . . he ahhh, after work one day . . . you know a couple times after work I took time off . . . just say . . . they might have you . . . you know they might of spotted you there with me . . . after . . . you know during working hours . . . one o'clock. . . . twelve o'clock . . . say, 'Oh no, I took days off' . . . you know . . . before you went over there. That's all I can tell you."

447.    With respect to RYBAK using union supplies for non-union purposes, RYBAK told BE24 to tell the FBI, "Anything he borrowed, anything he ever did, he's always, you know he buys supplies and

he says what's that, you just say he borrows supplies, he borrowed this or he borrowed that."

448.    RYBAK knew that BE24, at RYBAK's direction, had performed non-union work during union hours.

All in violation of Title 18 United States Code, Sections 1512(b)(1)(2) & (3).

FORFEITURE
Forfeiture Under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)

449.    The allegations of Counts 1 through 10, Counts 12 through 24, Count 26, and Counts 28 through 31 are hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a) (1)(C) and 28 U.S.C. § 2461(c).  As a result of the foregoing offenses, defendants JAMES C. DIMORA, ROBERT W. RYBAK, JERRY J. SKUHROVEC, MICHAEL D. GABOR and WILLIAM N. NEIHEISER shall forfeit to the United States all property, real and personal, which constitutes, or is derived from, proceeds traceable to the commission of Counts 1 through 10, Counts 12 through 24, Count 26, and Counts 28 through 31; including, but not limited to:

a.)    7254 Forestwood Drive, Independence, Cuyahoga County, Ohio (Permanent Parcel Number 563-11-038); more particularly: the value of the free and discounted improvements provided to defendant JAMES C. DIMORA at the property.

b.)    Ohio State jersey in a 38" x 30" frame with B. Wells and #28 inscribed thereon.

c.)    MONEY JUDGMENT: defendant JAMES C. DIMORA shall forfeit property, including, but not limited to, a sum of money equal to the proceeds of Counts 1 through 10, Counts 12 through 24, and Counts 26 and 28.  Defendant JAMES C. DIMORA is jointly and severally liable for this forfeiture obligation.

136

d.)    MONEY JUDGMENT: defendant ROBERT W. RYBAK shall forfeit property, including, but not limited to, a sum of money equal to the proceeds of Count 26, and Counts 28 through 31. Defendant ROBERT W. RYBAK is jointly and severally liable for this forfeiture obligation.

e.)    MONEY JUDGMENT: defendant JERRY J. SKUHROVEC shall forfeit property, including, but not limited to, a sum of money equal to the proceeds of Count 9.  Defendant JERRY J. SKUHROVEC is jointly and severally liable for this forfeiture obligation.

f.)    MONEY JUDGMENT: defendant MICHAEL D. GABOR shall forfeit property, including, but not limited to, a sum of money equal to the proceeds of Counts 20, 22, 24, and 26. Defendant MICHAEL D. GABOR is jointly and severally liable for this forfeiture obligation.

g.)    MONEY JUDGMENT: defendant WILLIAM N. NEIHEISER shall forfeit property, including, but not limited to, a sum of money equal to the proceeds of Counts 17 through 19.  Defendant WILLIAM N. NEIHEISER is jointly and severally liable for this forfeiture obligation.

<u>SUBSTITUTE PROPERTY</u>

450.    In the event that any property subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), as a result of any act or omission of defendant(s):

a.)    cannot be located upon exercise of due diligence;

b.)    has been transferred or sold to, or deposited with a third party;

c.)    has been placed beyond the jurisdiction of this Court;

d.)    has been substantially diminished in value; or,

e.)    has been commingled with other property which cannot be divided without difficulty,

137

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant(s), up to an amount equivalent to the value of the property forfeitable under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

A TRUE BILL

Original document -- Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.